**THE WAGNER FIRM**
Avi Wagner (#226688)
  *avi@thewagnerfirm.com*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:    (310) 491-7949
Facsimile:    (310) 491-7949

**BRAGAR EAGEL & SQUIRE, P.C.**
Lawrence P. Eagel
  *eagel@bespc.com*
David J. Stone
  *stone@bespc.com*
Todd H. Henderson
  *henderson@bespc.com*
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone:    (212) 308-5858
Facsimile:    (212) 486-0462

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| H SHEFF B SHEFF-MEISELMAN K SHEFF DAVID SHEFF FAMILY TRUST U/A DTD 09/06/2016, derivatively on behalf of GOPRO, INC., | Case No.: _____ |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | DEMAND FOR JURY TRIAL |
| NICHOLAS D. WOODMAN, BRIAN MCGEE, ANTHONY BATES, KENNETH GOLDMAN, PETER GOTCHER, ALEXANDER LURIE, MICHAEL MARKS and EDWARD GILHULY | |
| Defendants, | |
| and | |
| GOPRO, INC. | |
| Nominal Defendant | |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

Plaintiff H Sheff B Sheff-Meiselman K Sheff David Sheff Family Trust U/A DTD 09/06/2016 ("Plaintiff") brings this action derivatively for the benefit of nominal defendant GoPro, Inc. ("GoPro" or the "Company").  Plaintiff bases its allegations on personal knowledge as to its members, and upon information and belief as to all other matters.  Plaintiff's information and belief are based upon, among other things, the investigation of counsel, which included: the review and analysis of certain of the Company's Board of Directors (the "Board") minutes, Board packages, and other materials garnered through a demand for books and records and memoranda pursuant to 8 *Del. C*. §220 (the "220 Demand"); review of public filings with the United States Securities and Exchange Commission ("SEC"); review of public filings in federal courts, including in federal securities fraud litigation and review of press releases, news reports, analyst reports, and other information available in the public domain.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of GoPro against certain of its officers and directors seeking to remedy Individual Defendants' (as defined below) breaches of fiduciary duties, unjust enrichment, breaches of fiduciary duties for insider selling and misappropriation of information, violations of Cal. Corp. Code § 25402, and federal contribution and indemnification and have caused substantial harm to GoPro and the Company's shareholders.

2.     GoPro is a consumer electronics company that develops mountable and wearable cameras, drones, and related accessories which GoPro sells primarily through its website, and globally through retailers and wholesale distributors.

3.     On September 19, 2016, GoPro unveiled its Karma® quadcopter drone ("Karma" or "Karma drone"), which was GoPro's entry into the drone market.  GoPro stated that the Karma drone would be available on October 23, 2016 at select retailers, globally.  The drone was priced at $799.99 when sold by itself, $999.99 when bundled with the HERO5 Session Waterproof Camera ("HERO5 Session"), and $1099.99 when bundled with the HERO5 Black 4K Ultra HD Camera ("HERO5 Black Camera" and collectively, with HERO5 Session "HERO5").

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1

4.     GoPro's strategy was to leverage these new product launches during the holiday season to grow revenue and return to profitability in 2016.  As such, the vast majority of GoPro's 2016 revenue was expected to come from these particular launches.

5.     Beginning on February 3, 2016, GoPro gave guidance that the Company would bring in $1.35-$1.5 billion in revenue for the year 2016, revenue figures which the Individual Defendants continued to stand by throughout a majority of 2016.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

6.     Despite this knowledge, during a September 19, 2016 call, defendant Brian McGee ("McGee"), GoPro's Chief Financial Officer ("CFO"), told investors that GoPro remained "on track" to meet that revenue guidance, and that GoPro's new drone, Karma, would take GoPro to new heights.

7.     ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

8.     At that time, GoPro had at most 2,500 drones available to sell during the critical holiday period — meaning the most Karma could generate in revenues was approximately $2 million.  The Individual Defendants had led the market to believe that GoPro would need to sell 50,000-150,000 Karma drone units to meet its guidance.  Likewise, GoPro also experienced a supply shortage with its HERO5 line of cameras caused by difficulty with making the camera waterproof.

9.     The Karma drone was scheduled, after many delays, to launch on October 23, 2016 through select retailers worldwide, and the HERO5 cameras would be available to consumers on October 2, 2016.  Yet, on these launch dates, consumers were confronted with the unavailability

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

of these new products and voiced their concerns to GoPro, especially regarding the Karma drone. On the day of the Karma's purported launch, several users posted to GoPro's customer service website, its support hub, and GoPro's Facebook page lamenting the unavailability of the drone.

10. On October 24, 2016, TheStreet.com published the results of availability checks conducted by analysts at Longbow Research, noting that the shipment date for the Karma drone was moved from October 23, 2016 to November 28, 2016, that the HERO5 camera supply was low, and that retailers received few restocks of the HERO5 cameras since receiving initial shipments on October 2.

11. As a result, GoPro's shares fell $1.05 per share, or about 7% from the previous trading day's closing price of $14.93, to close at $13.88 on Monday, October 24, 2016.

12. Shortly thereafter, some of the few customers who managed to secure a Karma drone began reporting that their drones were inexplicably falling out of the sky. This was because GoPro's Karma drone had a significant design defect, which was an ill-fitting battery latch. Consequently, the Company was forced to remove the drones from the market during the key holiday period — negating whatever chance GoPro had of being profitable in 2016.

13. Unbeknownst to the public, the Individual Defendants had prior knowledge of the material facts about its product shortages and the Karma drones' design defect, ███████████ ████████████████████████████████████████████████████████████ ███████████████████

14. Additionally, GoPro utilized NetSuite, an enterprise resource planning ("ERP") cloud-based system which enabled *real-time access*[1] to the Company's inventory throughout its supply chain and distribution channel—or as GoPro's head of corporate development put it, GoPro "know[s] exactly how much product is at the distributors and sitting at our direct customers." At any time, the Individual Defendants could have generated an inventory status report and would

---

[1] All emphases are added and all internal citations and quotations are omitted unless otherwise noted.

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1    have recognized that the inventory GoPro had on hand and was available through its supply chain

2    rendered it impossible to meet the Company's guidance and customer demand.

3         15.    Moreover, GoPro's past supply chain issues with its HERO4 cameras made the

4    Individual Defendants keenly aware of the importance of inventory issues.  Specifically, because

5    GoPro had overestimated the demand for its prior camera model, the HERO4, when it first

6    launched, GoPro was stuck with an oversupply of HERO4 cameras that it needed retailers to clear

7    before they could sell the Company's HERO5 cameras.  Having learned that lesson, GoPro tracked

8    product sell-through, the ratio of inventory on hand to products sold to consumers, on a weekly

9    basis.

10        16.    With respect to the Karma drone's battery latch defect, GoPro would have been

11   made aware of the obvious battery defect had it adequately tested the drones.  GoPro also would

12   have been made aware of its Karma drones crashing, given that it scours the internet for videos

13   shot by its products.  On October 28, 2016, five days after the Karma drone launched, a YouTube

14   user named Brian Warholak posted a video of his drone falling out of the sky.  Soon thereafter,

15   other Karma users began posting similar videos on YouTube of their drones falling mid-flight.

16   Moreover, numerous Karma drone customers had posted on GoPro's own support hub regarding

17   their Karma drones' battery problems and unexpected falls, and reported those issues to GoPro's

18   customer service.

19        17.    After the market closed on November 3, 2016, GoPro stunned investors when it

20   released its third quarter revenues, and lowered its 2016 full year guidance to $1.25-1.3 billion and

21   its fourth quarter revenue guidance to $625 million (+/- $25 million).  GoPro attributed this revision

22   to "production ramp-up" issues which resulted in a shortage of HERO5 cameras and Karma

23   drones.  GoPro attributed the "bulk of the" revenue hit to the HERO5, not Karma.  GoPro also

24   explained that its fourth quarter revenues assumed that Karma would account for slightly less than

25   10%—or $60 million—of the Company's revenues. ████████████████████████

26   ████████████████████████████████████████████

27   ████████████████████

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

18.     As a result, GoPro's shares fell $0.78 per share, or over 6.5% from the previous day's closing price of $11.94, to close at $11.16 per share on November 4, 2016.

19.     Investors were unaware that even GoPro's lowered guidance was not feasible. With a supply of just 2,500 defective Karma drones, or around $2 million in drone sales, it would have been impossible to meet even the reduced guidance.

20.     Five days later, after the market closed on November 8, 2016, GoPro announced the recall of its Karma drones, disclosing for the first time that it had only produced and sold 2,500 drones, or about $2 million in revenue. This was a far cry from the roughly $60 million required to meet its lowered revenue guidance, let alone the 50,000-150,000 units of Karma drones the market had been led to expect previously. Although GoPro's reduced revenue guidance was "no longer feasible[,]" GoPro did not correct or update the guidance it issued five days earlier.

21.     On news of the recall and confirmation of the paltry supply of 2,500 Karma drones produced by GoPro, GoPro's shares fell $0.45 per share, or over 4% from the previous day's closing price of $10.86, to close at $10.41 per share on November 9, 2016.

22.     Then, on February 2, 2017, GoPro reported its fourth quarter and full year 2016 revenues. To the dismay of investors, GoPro missed its lowered guidance, making only $1.185 billion for the year and $540 million for the fourth quarter. While GoPro had earlier tried to minimize the effect of its Karma drones, the Company finally admitted that the Karma drone was the "*biggest challenge to [its] quarterly revenue[.]*" GoPro, Q4 2016 Earnings Call, at 2 (Feb. 2, 2017) (transcript on file with Bloomberg, Inc.).

23.     In response, GoPro's shares fell $1.39 per share, or over 12% from the previous day's closing price of $10.97, to close at $9.58 per share on February 3, 2017.

24.     Unbeknownst to shareholders, the true facts, *inter alia*, which were known and/or recklessly disregarded by the Individual Defendants, but concealed from the investing public, were the following:

a)     The Individual Defendants were throughout 2016 being kept up to date on the Company's 2016 product launches, including the Karma drones;

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

b)    GoPro lacked sufficient supply of Karma drones to meet demand and to make Karma readily available for sale globally on October 23, 2016 because GoPro had at most 2500 drones available for sale;

c)    GoPro lacked sufficient supply of HERO5 cameras to meet demand;

d)    GoPro's revenue and profitability guidance were not attainable due to GoPro's limited available supply of Karma drones and HERO5 cameras;

e)    GoPro was not "on track" to reach its revenue guidance due to GoPro's limited available supply of Karma drones and HERO5 cameras;

f)    Defendant McGee's statement that GoPro was still on track to meet its revenue guidance was false and misleading because he was aware of GoPro's supply shortages via GoPro's real-time inventory and supply monitoring systems and Board discussions;

g)    GoPro's Karma drone suffered from an obvious design defect that caused drones to lose power mid-flight and drop from the sky; and

h)    GoPro failed to conduct adequate quality control testing of its Karma drone that would have detected the design defect in the drone's battery latch.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Such jurisdiction exists because Plaintiff's state law claims are dependent on the resolution of substantial questions of federal law.  Specifically, the federal contribution claims asserted herein arise under and pursuant to the provisions of the Sections 10(b) and 21(D) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78u-4(g).

26.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

27.     Venue is proper in this Court because one or more of the defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to GoPro occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

28.     Plaintiff has been a shareholder of GoPro common stock at all relevant times, and has continuously held GoPro common stock at all relevant times.

29.     Nominal Defendant GoPro is a Delaware corporation with its principal executive offices located at 3000 Clearview Way, San Mateo, California 94402.  GoPro makes and sells mountable and wearable cameras, drones, and accessories.

30.     Defendant Nicholas Woodman ("Woodman") founded GoPro and has served as the Company's Chief Executive Officer ("CEO") and a member of the Board since 2004, as Chairman of the Board since January 2014 and as President from 2004 until June 2014.  Pursuant to the Company's annual proxy statement filed April 26, 2017 ("2017 Proxy"), Woodman is not independent.

31.     Defendant McGee was at all relevant times the CFO.

32.     Defendant Anthony Bates ("Bates") served as the Company's President from June 2014 to December 2016, and as a member of the Company's Board since June 2014.  Pursuant to the Company's 2017 Proxy, Bates is not independent.  Defendant Marks made the following stock sales based on his possession of inside information that the stock price of GoPro was artificially inflated:

| DATE | SHARES | PRICE | TOTAL |
|---|---|---|---|
| 8/15/16 | 6,403 | 15.61 | $99,950.83 |

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

7

33.   Defendant Kenneth Goldman ("Goldman") has served on the Company's Board since December 2013 and as lead independent director of the Company's board since April 2017. Goldman also served as Audit Committee Chair at all times relevant hereto.

34.   Defendant Peter Gotcher ("Gotcher") has served on the Company's Board since June 2014. Gotcher served as a member of the Audit Committee at all times relevant hereto.

35.   Defendant Alexander Lurie ("Lurie") has served on the Company's Board since February 2016.

36.   Defendant Michael Marks ("Marks") served on the Company's Board from February 2011 until April 2017. Defendant Marks made the following stock sales based on his possession of inside information that the stock price of GoPro was artificially inflated:

| DATE | SHARES | PRICE | TOTAL |
|---|---|---|---|
| 8/15/16 | 40,000 | 15.5783 | $623,132 |
| 8/31/16 | 264 | 14.94 | $3,944 |

37.   Defendant Edward Gilhuly ("Gilhuly") served on the Board from March 2011 until April 2017. Defendant Gilhuly made the following stock sales based on possession of inside information that the stock price of GoPro was artificially inflated:

| DATE | SHARES | PRICE | TOTAL |
|---|---|---|---|
| 8/17/16 | 225,000 | 15.3851 | $3,461,647 |
| 8/18/16 | 150,000 | 15.1855 | $2,277,825 |
| 8/19/16 | 325,000 | 14.9125 | $4,846,562 |

38.   Defendants Woodman, McGee, Bates, Goldman, Gotcher, Lurie, Lyne, Marks, and Gilhuly are herein referred to as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.   Due to their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty,

and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of GoPro were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.    conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1  reasonable inquiry in connection therewith, and take steps to correct such conditions or practices

2  and make such disclosures as necessary to comply with federal and state securities laws; and

3          e.      ensure that the Company was operated in a diligent, honest, and prudent

4  manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

5          42.     Each Individual Defendant, as a director and/or officer, owed to the Company and

6  its shareholders the fiduciary duties of loyalty, good faith, and candor in the management and

7  administration of the affairs of the Company, as well as in the use and preservation of its property

8  and assets.  The conduct of the Individual Defendants complained of herein involves a knowing

9  and culpable violation of their obligations as directors and officers of the Company, the absence

10 of good faith on their part, and a reckless disregard for their duties to the Company and its

11 shareholders that Individual Defendants were aware or should have been aware posed a risk of

12 serious injury to the Company.

13         43.     In addition, the Board has adopted a set of corporate governance guidelines to

14 promote the functioning of the Board and its committees and to set forth a common set of

15 expectations as to how the Board should perform its functions (the "Corporate Governance

16 Guidelines").

17         44.     The Corporate Governance Guidelines include the following language:

18     The following corporate governance guidelines have been approved and adopted
       by the Board of Directors (the "Board") of GoPro, Inc. (the "Company") for the
19     purpose of establishing the corporate governance policies pursuant to which the
       Board intends to conduct its oversight of the business of the Company in
20     accordance with its fiduciary responsibilities.

21     A. Role of the Board

22     The role of the Board is to oversee the performance of the chief executive officer
       ("CEO") and other senior management and to assure that the best interests of
23     stockholders are being served.  To satisfy this responsibility, the directors are
       expected to take a proactive approach to their duties and function as active monitors
24     of corporate management.  Accordingly, the directors provide oversight in the
       formulation of the long term strategic, financial and organizational goals of the
25     Company and of the plans designed to achieve those goals.  In addition, the Board
       reviews and approves standards and policies to ensure that the Company is
26     committed to achieving its objectives through the maintenance of the highest
       standards of responsible conduct and ethics and to assure that management carries
27     out their day-to-day operational duties in a competent and ethical manner.

28

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

The day-to-day business of the Company is carried out by its employees, managers and officers, under the direction of the CEO and the oversight of the Board, to enhance the long term value of the Company for the benefit of stockholders. The Board and management also recognize that creating long term enterprise value is advanced by considering the interests and concerns of other stakeholders, including the Company's employees, customers, creditors and suppliers as well as the community generally.

The Board understands that effective directors act on an informed basis after thorough inquiry and careful review, appropriate in scope to the magnitude of the matter being considered. The directors know their position requires them to ask probing questions of management and outside advisors. The directors also rely on the advice, reports and opinions of management, counsel and expert advisers. In doing so, the Board evaluates the qualifications of those it relies upon for information and advice and also looks to the processes used by managers and advisors in reaching their recommendations. In addition, the Board has the authority to hire outside advisors at the Company's expense if they feel it is appropriate.

45.     The Company has also adopted a Code of Business Conduct and Ethics (the "Code"). The Code states:

OUR CODE OF HONOR

Let honor and integrity lead the way.

At GoPro, we're committed to legal and ethical conduct in every area of business, across the board. The Code of Business Conduct and Ethics, also known as "the Code," is a cornerstone of our commitment to integrity. It summarizes the standards GoPro expects all of us to meet, regardless of location or role.

While efforts have been made to ensure the Code covers the most relevant information, it's impossible to anticipate all of the challenges or questions you might face. So in addition to the standards outlined here, ensure your actions are consistent with the laws, regulations and company policies that apply to your specific role and the countries in which you operate.

Employees, executives and members of the board are expected to know and follow the Code. Contractors, agents, sales reps, distributors and partners need to comply with the Code as well whenever conducting business on behalf of GoPro.

While the rules within the Code are specific, the sentiment is universal: Whenever in doubt, let honor and integrity lead the way.

\*        \*        \*

INTERNAL CONTROLS AND FINANCIAL RECORDS

Be diligent. Be accurate. Be compliant.

Maintaining internal controls and ensuring complete, accurate and timely books, records and disclosures is more than a legal requirement at GoPro—it's essential to

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

our success. Our customers, partners, suppliers and investors rely on the information we provide to decide whether to purchase our products, partner with us or invest in our shared future.

As a GoPro employee, you're required to follow the internal controls that apply to your job or function. As a GoPro manager or executive, you're responsible for ensuring that an adequately operating system of internal controls related to your function is in place, is effective, and addresses the company's business needs and compliance requirements. Maintaining complete, accurate, and timely records.

At GoPro, we require that you accurately record sales, revenues, expenses, operational data, decision metrics and other essential company information. This includes:

• Providing complete, accurate and transparent information in all reports, records and expense claims.

• Providing accurate, transparent and complete backup for all expenses.

• Never deliberately making a false, artificial or misleading entry in a report, record or expense claim.

• Always disclosing to your immediate manager or executive any information that may impact our financial records, our relationship with partners or the company's reputation.

• Never establishing or maintaining an undisclosed or unrecorded side agreement, account, fund or asset.

46.    In addition, the Company's Audit Committee, Defendants Goldman (Chair), Gotcher, and Gilhuly, was specifically tasked with the Board's oversight responsibilities.  The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Audit Charter").

47.    Pursuant to the Audit Charter:

PART 1: PURPOSE

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of GoPro, Inc. (the "Company") is to assist the Board in fulfilling its oversight responsibilities related to the Company's financial accounting, reporting, and controls.  The Committee's principal functions are to assist the Board in its oversight of:

a. the integrity of accounting and financial reporting processes of the Company and the audits of the Company's financial statements by the Company's independent auditors (the "Independent Auditors");

b. risk management;

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

c. the independence and performance of the Independent Auditors;

d. the performance of an effective Internal Audit function; and

e. compliance by the Company with legal and regulatory requirements.

This charter (the "Charter") sets forth the authority and responsibility of the Committee in fulfilling its purpose. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. This is the responsibility of the Company's management and the Independent Auditors.

*        *        *

PART 3: RESPONSIBILITIES

The principal responsibilities and duties of the Committee in serving the purposes outlined in Part I of this Charter are set forth below. These duties are set forth as a guide with the understanding that the Committee will carry them out in a manner that is appropriate given the Company's needs and circumstances. The Committee may supplement them as appropriate and may establish policies and procedures from time to time that it deems necessary or advisable in fulfilling its responsibilities.

The Committee will:

_Financial Statements and Disclosures_

1.      Review and discuss with management the Company's quarterly results and the related earnings press release prior to distribution to the public. Periodically discuss on a general basis with management the type of information to be disclosed and type of presentation to be made regarding released financial information.

2.      Review the Company's quarterly and annual financial statements.

3.      In connection with the Committee's review of the annual financial statements:

      a.      discuss the financial statements and the results of the Independent Auditors' audit of the financial statements with the Independent Auditors, the internal audit department, and management;

      b.      discuss any items required to be communicated by the Independent Auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB"). These discussions should include an overview of the audit strategy, the Independent Auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

clarity of the disclosures in the Company's financial statements, the representations the Independent Auditors are requesting from the Company's management and any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information;

c.      discuss with the Company's management and the Independent Auditors the Company's selection, application and disclosure of critical accounting policies and practices; and

d.      review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

4.      Recommend to the Board whether the annual financial statements should be included in the Company's Annual Report on Form 10-K.

5.      In connection with the Committee's review of the quarterly financial statements:

a.      discuss with the Independent Auditors and the Company's management the results of the Independent Auditors' SAS No. 100, Interim Financial Information (Codification of Statements on Auditing Standards, AU § 722), or similar, review of the quarterly financial statements;

b.      discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, policies, judgments or estimates with the Company's management and the Independent Auditors; and

c.      review the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

6.      Resolve any disagreements between the Company's management and the Independent Auditors regarding financial reporting.

_Internal Controls_

7.      Review and discuss with the Independent Auditors and the Company's management their periodic reviews of the adequacy of the Company's accounting and financial reporting processes and systems of internal control, including any significant deficiencies and material weaknesses in their design or operation.

8.      Review any allegations of fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Committee.

9.      Discuss any comments or recommendations of the Independent Auditors outlined in their annual management letter or internal control reports.   If

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

appropriate, approve a schedule for implementing any recommended changes and monitor compliance with the schedule.

10.     Periodically consult with the Independent Auditors about internal controls, the fullness and accuracy of the Company's financial statements and any other matters that the Committee or the Independent Auditors believe should be discussed privately with the Committee.

11.     Meet separately, periodically, with management and with internal auditors (or other personnel responsible for the internal audit function)

12.     Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to risk assessment and risk management.

13.     Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

*Independent Auditors*

14.     Be directly responsible for the selection, compensation, retention and oversight of the work of the Independent Auditors.  The Independent Auditors will report directly to the Committee.

15.     Review the continuing independence of the Independent Auditors, including:

    a.     obtaining and reviewing, on an annual basis, a letter from the Independent Auditors describing all relationships between the Independent Auditors and the Company required to be disclosed by the applicable requirements of the PCAOB;

    b.     reviewing and discussing with the Independent Auditors their independence, including the nature and scope of any such relationships; and

    c.     taking appropriate action to oversee the independence of the Independent Auditors, including discontinuing any relationships that the Committee believes compromise the independence of the Independent Auditors.

16.     Approve the Company's hiring of employees or former employees of the Independent Auditors, as required by regulations and by applicable listing standards.

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

17.    Review and approve the final proposals for audit planning, scope and staffing developed by the Independent Auditors.

18.    Approve the fees and any other compensation to be paid to the Independent Auditors.  Approve any non-audit services to be provided by the Independent Auditors permitted by the Exchange Rules, Commission Rules and applicable law or regulation.  The Committee may establish pre-approval policies and procedures, as permitted by the Exchange Rules, Commission Rules and applicable law, for the engagement of the Independent Auditors to render services to the Company, including without limitation policies that would allow the delegation of pre-approval authority to one or more members of the Committee, provided that any pre-approval decision is reported to the Committee at its next scheduled meeting.

19.    Review and discuss with the Independent Auditors the reports delivered to the Committee by the Independent Auditors regarding:

         a.    critical accounting policies, estimates and practices used;

         b.    alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, the ramifications of the alternatives, and the treatment preferred by the Independent Auditors; and

         c.    other material written communications between the Independent Auditors and the Company's management, such as any management letter or schedule of unadjusted differences.

20.    Conduct an annual review of the Independent Auditor's report describing its internal quality-control procedures; any material issues raised within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with any such issues.

*Compliance*

21.    Review the effectiveness of the Company's systems for monitoring compliance with laws and regulations and the results of management's investigation and follow-up (including disciplinary action) of any instances of material or significant noncompliance.

22.    Review the findings of any examinations by regulatory agencies, and any auditor observations.

23.    Consider waivers of the Code of Business Conduct and Ethics (other than transactions that are subject to review by the Board as a whole or any other committee of the Board), including waivers requested for executive officers and directors (other than where the potential waiver involves a member of the Committee, in which event, such waiver shall be subject to the review of the Board), and retain authority to grant any such waivers.

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

16

*General*

24.     On a regular basis, review the status of any legal matters that could have a significant impact on the Company's financial statements.

25.     Annually prepare a report to the Company's stockholders for inclusion in the Company's annual proxy statement as required by the Commission Rules.

26.     Regularly report to the board of directors about committee activities, issues, and related recommendations.

27.     The Committee will evaluate the Committee's composition and performance on an annual basis and submit a report to the Board.  The Committee also will review and reassess the adequacy of this Charter periodically, and recommend to the Board any changes the Committee determines are appropriate.

28.     Take such other actions and perform and carry out any other responsibilities and duties delegated to it by the Board or as the Committee deems necessary or appropriate consistent with its purpose.

48.      In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Goldman (Chair), Gotcher and Gilhuly, who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls over public reporting of the acquisitions or the integration of the acquired companies finances into those of GoPro, resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders.

1

## FACTUAL BACKGROUND

2

### A.    GoPro

3

49.    GoPro makes mountable and wearable "capture devices," *i.e.*, cameras, drones, and

4 accessories, which it sells on its website, and through retailers and wholesale distributors.[2]

5 GoPro's core products have traditionally been its HERO line of cameras.

6

50.    Like many companies today, GoPro has instituted an enterprise resource planning

7 system ("ERP").

8

51.    ERP is a process by which a company manages and integrates the important parts of

9 its business.   ERP systems integrate areas such as planning, purchasing, inventory, sales,

10 marketing, finance, and human resources.

11

52.    ERP software, at its most basic level, integrates the processes that are essential to

12 running a business, including inventory and order management, accounting, human resources, and

13 customer relationship management ("CRM").  CRM is a business strategy that optimizes revenue

14 and profitability while promoting customer satisfaction and loyalty. CRM software provides

15 functionality to companies in sales, marketing, customer service, and digital markets.

16

53.    The central feature of all ERP systems is a shared database that supports multiple

17 functions that are used by different business units, meaning that employees in different divisions

18 can rely on the same information for their specific needs.

19

54.    Cloud-based ERP enables ***real-time*** reporting and business intelligence,[3] which aids

20 executives and staff who seek visibility into their business.

21

22

23 _____

[2]   Approximately half of GoPro's revenue comes from sales made to consumers outside the U.S.

24 *See* annual report filed on Form 10-K on February 29, 2016 ("2015 Form 10-K") at 5 ("Sales to customers outside the U.S. were more than 50% of our 2015 revenue and have increased from 43%

25 in 2014.").

[3]   "Business intelligence is an umbrella term that includes the applications, infrastructure and tools,

26 and best practices that enable access to and analysis of information to improve and optimize

27 decisions    and    performance."    Business    Intelligence,    IT    Glossary,    Gartner, http://www.gartner.com/it- glossary/business-intelligence-bi/.

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

55.   Among other things, an ERP solution provides a global, ***real-time*** view of data that can enable companies to address concerns proactively and drive improvements.

56.   NetSuite is a cloud-based software as a service that allows a company to integrate its ERP, accounting, CRM, and web capabilities.

57.   In or around December 2009, GoPro chose NetSuite to be its ERP service provider.

58.   Among other things, NetSuite's ERP provides users with the ability to manage "end-to-end inventory and inbound/outbound logistics in ***real-time***."

59.   As shown below, NetSuite's ERP also has a "report" function that allows users to view reports such as "forecast v. quota," "current inventory status," "current inventory turnover," "inventory revenue," and "inventory status report[s]."  NetSuite's ERP system may be used by various members of an organization, including senior executives.

60.   NetSuite also provides "SuiteFlow," a workflow management tool that helps users customize and automate business processes.   *Workflow Engine Suiteflow*, NetSuite, http://www.netsuite.com/portal/platform/developer/suiteflow.shtml.   One of SuiteFlow's key benefits is that it allows a Company to "[i]mprove responsiveness by enabling continual tracking of various steps in a business process." *Id.*

61.   During a June 2011 conference, GoPro's then-Chief Technology Officer ("CTO") Stephen Baumer ("Baumer") explained that the Company decided in or around December 2009 that it needed a solution to the communication problems it faced with its different vendors and logistics partners.  According to Baumer, GoPro chose NetSuite to bring its supply chain into holistic view and to add accounting, full-fledged ERP, an eCommerce platform, and a CRM platform to get a complete view of its product and customers at the same time.

62.   Baumer explained that when the Company implemented NetSuite, it had only 8 employees.  Because of its small size, they could grow the business around NetSuite.  NetSuite enabled GoPro to share and collaborate on its supply chain with suppliers and to give suppliers access to GoPro's account to view pertinent information.

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

63. Baumer also mentioned using NetSuite's "SuiteFlow" feature, and noted that NetSuite's advanced manufacturing module, introduced in or around 2010, gave the Company even more visibility and functionality around materials requirement planning, change control, and demand planning.[4]

64. As NetSuite would report in May 2012, GoPro uses "NetSuite to run its ERP, manage a globally distributed supplier network, inventory logistics, accounting and eCommerce in the cloud while having ***real-time visibility into business performance across its global supply chain, customers, suppliers and inventories, as well as production planning, change control and demand planning***." Press Release, *NetSuite Implementation at GoPro named to top 100 list by Supply & Demand Chain Executive Magazine*, http://www.netsuite.com/portal/press/releases/nlpr05-22-912.shtml (May 21, 2012).

65. On information and belief, the Company continues to use NetSuite's ERP software.

66. In addition to monitoring its supply chain, GoPro also "engag[es] with customers . . . to introduce meaningful and empowering new features that expand the versatility and performance of [its] products." 2015 10-K at 7. One of the ways GoPro monitors the usage of its products is through user-provided videos. GoPro "scours" the internet, including YouTube, for videos captured via the Company's devices. *See* CBS News, 60 Minutes, *GoPro's Video Revolution*, http://www.cbsnews.com/news/gopros-video-revolution/ (Nov. 10, 2013); Reddit, *Hey Reddit . . . howzit?! Nick Woodman. Founder/CEO of GoPro, AMA!* (Oct. 6, 2016).

---

[4] "A materials requirement planning (MRP) information system is a sales forecast-based system used to schedule raw material deliveries and quantities, given assumptions of machine and labor units required to fulfill a sales forecast." Demand planning is "[t]he development of a forecast that reflects known constraints and any possible associated impacts that may occur as a result of external events, capacity (either production or logistics) or changing priorities." Change control "is a systematic approach to managing all changes made to a product or system. The purpose is to ensure that no unnecessary changes are made, that all changes are documented, that services are not unnecessarily disrupted and that resources are used efficiently."

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

67.     Additionally, GoPro's website serves as a hub for its "community" of users.  On the Company's support hub, GoPro's customers can post questions, as well as share and find solutions and stories regarding their GoPro devices.

**B.      GoPro's Previous Flawed Product Launches**

68.     On July 12, 2015, the HERO4 Session camera, GoPro's smallest, lightest, and most convenient camera and key new product offering for 2015, went on sale.

69.     When GoPro released the HERO4 Session camera, it produced cameras in excess of the market's demand.  This resulted in a $21 million impact to revenue from price reductions on the HERO4 Session, $40 million from price protection charges for the camera in the fourth quarter of 2015, and a $57 million write down of excess purchase order commitments, excess inventory, and obsolete tooling.

70.     On October 28, 2015, GoPro announced that it was aware of weak initial sell- through—*i.e.*, "the amount or percentage of a product that is sold to consumers relative to the total quantity available in stores" of the HERO4 Session in late July 2015.

71.     Due to overproduction, GoPro's retail channel was so full of its HERO4 line of cameras that GoPro spent the first three quarters of 2016 waiting for retailers to sell-through what they had already bought from GoPro.  As defendant Woodman characterized it, 2016 was to serve as "a bit of a correction year for [GoPro] because [in 2015 GoPro] introduced too many products at confusing price points." Bloomberg, *GoPro CEO: Karma Drone Is 'Phenomenal' Addition to Lineup*, https://www.youtube.com/watch?v=9rtVhjdHI1Y (Oct. 3, 2016).

**C.      GoPro's 2016 Product Launches**

72.     In 2016, the Company had set its eyes on the consumer drone market, and prepared to launch its all-new line of HERO5 cameras by the holiday season.

73.     GoPro planned to enter the drone market with the launch of its "Karma" drone. GoPro initially told investors that Karma would hit "store shelves in the first half of 2016."  GoPro, Q4 2015 Earnings Call, at 4 (Feb. 3, 2016) (transcript on file with Bloomberg, Inc.).  During GoPro's February 3, 2016 conference call, defendant Bates noted that the Company created a

registration page on its website in November 2015 "*where more than 100,000 consumers have already registered to receive updates about Karma*." *Id* at 4.

74.     On February 3, 2016, GoPro issued its 2016 full-year revenue guidance, stating that GoPro expected revenue of approximately $1.35 to $1.5 billion.  Press Release, *GoPro Announces Fourth Quarter and Full Year 2015 Results*, http://investor.gopro.com/press-releases/press-release-details/2016/GoPro-Announces-Fourth-Quarter-and-Full-Year-2015-Results/default.aspx (Feb. 3, 2016).

75.     On May 5, 2016, defendant Woodman told investors that Karma's launch would be delayed to the 2016 holiday season.  GoPro, Q1 2016 Earnings Call, at 3 (May 5, 2016) (transcript on file with Bloomberg, Inc.).  Woodman assured investors that "Karma includes revolutionary features that differentiate[d] [it] from other drones.  Features that make it much more than a drone and deliver the versatility, value and performance that consumers expect from GoPro.  *To give ourselves more time to fine-tune these features, we have made the difficult decision to push Karma's launch to the holidays*."  *Id*.  Notwithstanding the Karma drone's delay, GoPro maintained its revenue guidance (*id.* at 6) "contemplate[ing] a *tremendous* level of success for both the Karma drone and the new HERO cameras."  Wedbush, *The Delay of GoPro's Drone Leads to Bad Karma for Investors*, at 22 (May 6, 2016).

76.     On July 27, 2016, GoPro announced its second quarter 2016 results and maintained its revenue guidance of $1.35 to $1.5 billion.  Press Release, *GoPro Announces Second Quarter 2016 Results*, http://investor.gopro.com/press-releases/press-release-details/2016/GoPro-Announces-Second-Quarter-2016-Results/default.aspx (July 27, 2016).

77.     That same day, GoPro held a conference call with investors.  During that call, defendant McGee answered an analyst's question regarding GoPro's channel inventory stating, "I think we've done a great job in channel inventory. . . . The existing products continue to sell out in the summer months and *then be ready for a heck of a launch in the second half*."  GoPro, Q2 2016 Earnings Call, at 11 (July 27, 2016) (transcript on file with Bloomberg, Inc.).  With respect to GoPro's upcoming Karma and HERO5 launch, defendant Woodman responded to an analyst's

question regarding retail space and GoPro's launch strategy, stating:

> **[W]hat I can say is that we have shared Karma with some of our key retailers and we've shared our other new products with some of our key retailers and the reception has been fantastic.** . .  And another point to note on is that this year we're doing a much better job of communicating with our retailers globally to prepare together as a team for new product launches and to maximize the marketing opportunities around those launches.  And that's something that we've never really done a terrific job of before because strategically we held our new products much more closer to the vest and kept it secret from our retailers up until just before launch. **And we realized last year that we needed to be a much better partner with our retailers and get ahead of it earlier so that we could plan big launches with them.**  And that's something that I'm very proud of that we've changed our approach to channel marketing.  And we expect it to bear fruit this second half.

*Id.* at 12.

78.    Defendant Woodman based his enthusiasm on his personal experience, stating, "**I have been using Karma extensively and it's so much more than a drone.**" *Id.* at 2.

79.    Defendant McGee also noted that for the second half of 2016, GoPro would "manage both sell-in[5] and sell-through each quarter to be as close as they can be even with our product launches.  So we don't get too far ahead or behind ourselves and **we manage both our inventories and the inventories of the channel.**"  *Id.* at 6.  Defendant Bates also assured investors that GoPro was **"closely tracking [inventory] and making sure that [it] can ramp into our second half plans"** and that GoPro "**fe[lt] really good about [its] inventory right now.**"  *Id.* at 11.

80.    Then, at the August 9, 2016 Pacific Crest Global Technology Leadership Forum, Colin Born ("Born"), GoPro's Head of Corporate Development, stated to investors with respect to Karma's potential customer base, "**[o]ur view is that the consumer drone market is half a million to a million maybe. . . .**  Those of us around GoPro who have been using Karma over the last month, and who are drone enthusiasts, we're bubbling."  GoPro, Pacific Crest Global Technology Leadership Forum, at 5 (Aug. 9, 2016) (transcript on file with Bloomberg, Inc.).

---

[5]  Sell-in is defined as "[t]he sale of goods to retail traders prior to public retailing." Oxford Dictionary, Definition of sell-in, https://en.oxforddictionaries.com/definition/us/sell-in (last visited Oct.17, 2017).

81.     During the call, Born also highlighted the fact that *"over the last 18 months, I think [GoPro] [has] done a really good job of expanding our visibility into the channel and **knowing exactly how much product is at the distributors and sitting at our direct customers.**" Id.* at 6.

82.     On September 19, 2016, GoPro unveiled the HERO5 Session, and the HERO5 Black, and the Karma drone.

83.     GoPro's press release that announced the unveiling of these products listed their respective prices and the dates on which they would become available for sale.  The HERO5 Session and HERO5 Black cameras were priced at $299.99 and $399.99, respectively, and were listed as being available on October 2, 2016.  The Karma was priced at $799.99 without a GoPro camera, $999.99 when bundled with the HERO5 Session, and $1099.99 when bundled with the HERO5 Black.  The Karma was listed as being available on October 23, 2016.

84.     These products were expected to produce "the vast majority of [GoPro's] full-year revenue occurring in the second half of the year."  GoPro, Q1 2016, at 6 (May 5, 2016) (transcript on file with Bloomberg, Inc.).

85.     On the same date, GoPro held a conference call with investors to discuss the new product launch.  During the call, defendant Woodman stated that HERO5 cameras would be "distributed through all GoPro retailers globally[,]" while the Karma would be "**distributed through select retailers around the world[.]**"  GoPro, Analyst and Investor Meeting, at 2 (Sept. 19, 2016) (transcript on file with Bloomberg, Inc.) ("Sept. 19, 2016 Tr.").  Defendant McGee also stated that GoPro was "**on track**" to meet its revenue guidance of $1.35 to $1.5 billion.  *Id.* at 4.

86.     In reality, GoPro was not "on track" to meet its revenue guidance.  The Individual Defendants neglected to mention that, at most, the Company had only 2,500 Karma drones in supply, or approximately $2 million worth of drones instead of the 50,000-150,000 units the market had been led to believe GoPro would sell—a deficit which rendered it unable to meet its $1.35-1.5 billion guidance.  *See* Piper Jaffray, It Appears A "Karma Christmas" is Canceled with GoPro's Latest Recall (Nov. 8, 2016); Wedbush, GoPro Unveils New HERO5s and Karma Drone (Sept. 20, 2016).

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

24

87.     To put this number in perspective, the day after the Karma was unveiled, Wedbush published an analyst report in which it estimated that revenue attributable to Karma for the fiscal year 2016 (meaning drones sold between October 23 and December 31, 2016), would be $96 million, reflecting an estimate of 150,000 units sold during that two-month period at a wholesale price of $640 per unit. *See* Wedbush, GoPro Unveils New HERO5s and Karma Drone (Sept. 20, 2016); see also GoPro, Q4 2015 Earnings Call, at 4 (Feb. 3, 2016) (transcript on file with Bloomberg, Inc.) (Bates stating that "more than 100,000 consumers . . . registered to receive updates about Karma[.]").   The Individual Defendants had access to these facts in real-time because GoPro utilized NetSuite, which for the reasons set forth above would have alerted GoPro management and the Board to the production ramp-up issues.

88.     On October 3, 2016, in an interview with Bloomberg West, defendant Woodman affirmed that GoPro was ready to make Karma "***available on October 23rd[.]***"  Bloomberg, *GoPro CEO Nick Woodman on 'Bloomberg West'*, https://www.youtube.com/watch?v=yCF1ojGgXSY (Oct. 3, 2016).   During that same interview, Woodman mocked competitor DJI's drone, stating, "as we talked before the show, you had a DJI and ***you crashed it on one of your first flights right? And you've never returned to flying a drone since.***"  *Id*.

89.     On October 23, 2016, GoPro posted a picture of its drone on Twitter with the caption, "#***GoProKarma           is           here***."                 GoPro,              Twitter.com, https://twitter.com/GoPro/status/790198144940187648 (Oct.23, 2016).   User ChadGriffiths replied to GoPro's tweet (*i.e.*, Twitter post), "You keep saying 'here[.]'  I don't think that means what you think it means."  *Id*.  GoPro tweeted back, "Unfortunately with the high demand for Karma, we had to concentrate initial inventories in N. America - stay tuned!"  In fact, due to a material shortage of drones, Karma drone buyers were told that the drone would not ship until November 28, 2016.

90.     Indeed, GoPro was aware of Karma shortages prior to the launch date.  Just four days **before** the Karma's October 23rd launch, hopeful GoPro customer rapidridge66855 asked on the GoPro support hub when the Karma drone would be available in the United Kingdom.   GoPro

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

Support Hub, Karma, *Where Can I Buy One in the UK?* (Oct. 14, 2016).  GoPro Community Manager Jeff responded on October 19, 2016 that "[d]ue to what we anticipate will be higher than expected demand, the October 23 Karma launch will [be] a US launch only.  The Karma will be available internationally soon[,]" reversing GoPro's prior statement that Karma's launch would be through select retailers globally, and cutting off approximately 50% of the Karma drone's potential consumer base (*see* 2015 10-K at 5).

91.    On October 23, 2016, the day of the Karma launch, several consumers posted to GoPro's Facebook page, complaining of Karma's unavailability.  One customer complained, "Wow after waiting since the announcement we can't buy it on the release date? Well we can but won't have it for a few more weeks looks like it's time to start looking at different drones[.]" Facebook, *GoPro Karma is Here*, https://www.facebook.com/gopro/photos/a.383457956918.165320.50043151918/101541993396 46919/?type=3&permPage=1 (Oct. 23, 2016).  Another posted, "I love how GoPro keeps pushing this drone and advertising it like you can actually buy the damn thing. No, you can't.  It's been advertised to release today for a month. . .. So, quit saying it's available and keep misleading everyone." *Id*.   A GoPro consumer and shareholder posted, "I am a Consumer and stockholder, selling stock first thing in the morning.  So much has been riding on this launch and the stock will be crashing! At sometime you just have to cut your loss and move on.  I've been waiting for Karma for a year now.. [sic] This is absolutely unacceptable!!"  *Id*.

92.    Then, one day after the Karma's launch, the website DroneFlyer noted that "Karma is not available in many configurations—even on a backorder basis," and that GoPro claimed November 28, 2016 as a ship date for Karma.  Craig Issod, DroneFlyers.com, *GoPro Karma Drone – Instant Karma, Bad Karma or Good Karma?* (Oct. 24, 2016); *see also* Leo Sun, *Did GoPro Inc's Karma Get Delayed Again?* The Motley Fool (Oct. 27, 2016) (speculating about whether the drone was facing overwhelming demand or production and supply chain issues in light of reports that initial shipment dates for the drone were being pushed back to November 2016); Piper Jaffray, *It Appears A "Karma Christmas" Is Canceled With GoPro's Latest Recall*, (Nov. 8, 2016) (noting

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

that on October 25th, just two days after Karma's launch, GoPro's website indicated that the drone was "coming soon" and that its ship date was expected to be "on or before November 28."). TheStreet also published a report noting that the Company "delayed its shipment date for its new Karma drone to November 28 from October 23 this weekend."  TheStreet, *GoPro (GPRO) Stock Slides, Longbow Bearish*, https://www.thestreet.com/ story/13864243/1/gopro-gpro-stock-slides-longbow-bearish.html (Oct. 24, 2016).

93.     The market's suspicions regarding the Karma drone's unavailability and low supply affected GoPro's stock price, and on this news GoPro's shares fell $1.05 per share, or about 7% from the previous Friday's closing price of $14.93, to close at $13.88 on Monday, October 24, 2016.

94.     The few customers who managed to secure one of GoPro's 2,500 drones soon began reporting problems with their drones that caused the drones to drop like a rock mid-flight.

95.     On October 28, 2016, five days after the Karma drone's product launch, Youtube.com user Brian Warholak uploaded a video of his Karma drone crashing *two minutes into flight*, and contacted GoPro regarding this issue. https://www.youtube.com/watch?v=i4nRalvmBhA.  Soon thereafter, other videos were uploaded on YouTube by Karma owners experiencing similar issues.  *See, e.g.*, Michael Carter, *Gopro karma crash- RECALLED* (Nov. 6, 2016); Drone Tech, *GoPro Karma Crash Drone Compilation – This is Why GoPro's Recalling Karma Drone*, https://www.youtube.com/watch?v=Kr63Ja0jZ04&t=5s (Nov. 10, 2016).  Youtube.com user Robert Lawrence posted a video showing that the "battery clearly does not fit[,]" and that "[t]he amount of force needed is *well beyond what is comfortable*."  Ex. A, Robert Lawrence, *GoPro Karma Battery Fit Issue – It Doesn't Fit!*, *available at* https://www.youtube.com/watch?v=4Mds8wKRLe0 (Nov. 8, 2016).

96.     Other users posted directly on GoPro's support hub regarding Karma's defects.  On October 28, 2016, user agilevista7555 started a thread on GoPro's Support Hub titled "My new Karma battery has a defect."  https://community.gopro.com/t5/Karma/My-new-Karma-battery-

has-a-defect/m-p/18853#M1330.  Specifically, a problem with the battery's latch kept the battery "from going all the way into the Karma."  *Id*.  User agilevista7555 had contacted GoPro's customer service regarding the issue, and was asked to and supplied GoPro pictures and videos of his drone's defect. *Id*.  On November 6, 2016, user nickk10 started a thread on GoPro's Support Hub titled "WARNING: GoPro Karma Falls Out Of The Sky[,]" describing his and "at least two" others' experiences with Karma inexplicably falling out of the sky despite being fully charged. https://community.gopro.com/t5/Karma/WARNING-GoPro-Karma-Falls-Out-Of-The-Sky/td-p/20086.  GoPro's Community Manager, Jeff Terrell, who posted under the moniker "jefft[,]"responded that GoPro "investigate[s] every issue separately to try to find out what happened[.]"  *Id*.  User nickk10 also contacted GoPro's customer support regarding his drone falling mid-flight.  *Id*.

97.    Unfortunately, those Karma drones that made it to market had a material design defect, "inherent in [Karma's] design."  The drone's battery latch had a design flaw such that the "batteries disconnected during flight resulting in a loss of power."  GoPro, Q4 2016 Earnings Call, at 2 (Feb. 2, 2017) (transcript on file with Bloomberg, Inc.).  The battery "clearly" did not fit without forcing it in place, causing the drone's battery, as Woodman had put it, to "pop out on occasions."  Video, Techcrunch.com, *Real Talk From GoPro's Nick Woodman*, https://techcrunch.com/video/real-talk-from-gopros-nick-woodman/586e977f1c689938f93e63ce/ (Jan. 5, 2017).

98.    This defect was hazardous and caused drones to fall out of the sky without warning mid-flight.

99.    As investors and Karma drone purchasers would later discover, the only solution for this defect was to recall the drones and "***redesign[] [the] latch***[.]"  GoPro, Q4 2014 Earnings Call, at (Feb. 2, 2017) (transcript on file with Bloomberg, Inc.).

100.   It was not until the Company announced the recall of the drone on November 8, 2016 that investors learned just how insignificant sales were of the Karma drone.  GoPro had produced and sold just ***2,500*** drones.

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

101.   GoPro also had significant production issues with its HERO5 cameras, caused by its waterproof design.  These issues also impacted the HERO5's revenues for the second half of 2016. *See* GoPro, Q3 2016 Earnings Call, at 6 (Nov. 3, 2016) (transcript on file with Bloomberg, Inc.). GoPro's management had access to these facts in real-time, because GoPro utilized NetSuite, which would have alerted GoPro and its management to the production ramp-up issues.

102.   Despite the problems with the Karma and HERO5, on September 19, 2016, defendant McGee stated that GoPro was "***on track***" to meet its revenue guidance of $1.35 to $1.5 billion.  Sept. 19, 2016 Tr. at 4.  Then, on October 3, 2016, defendant Woodman affirmed that GoPro would perform to expectations in the third and fourth quarters, stating that GoPro's HERO5 sales were going to result in a "***very nice post-holiday up-tick***" for GoPro fans and investors. Video, CNBC, *GoPro CEO: New cameras, drone, cloud upload make for a strong Q4*, http://www.cnbc.com/2016/10/03/gopro-ceo-new-cameras-drone-cloud-upload-make-for-a-strong-q4.html (Oct. 3, 2016).

103.   Just three weeks after the HERO5's October 2nd launch, TheStreet reported that availability checks of HERO5 products indicated that supply was low, and that retailers received few restocks of the cameras since receiving initial shipments on October 2nd.  The Street, *GoPro(GPRO)              Stock              Slides,              Longbow              Bearish*, https://www.thestreet.com/story/13864243/1/gopro-gpro-stock-slides-longbow-bearish.html (Oct. 24, 2016).

104.   Then, on November 3, 2016 after the market closed, GoPro lowered its revenue guidance from $1.35–1.5 billion, to $1.25–1.3 billion, and guided $625 million in revenue, plus or minus $25 million, for the fourth quarter of 2016.  Press Release, *GoPro Announces Third Quarter      2016      Results*,      http://investor.gopro.com/press-releases/press-release-details/2016/GoPro-Announces-Third-Quarter-2016-Results/default.aspx      (Nov.   3,   2016). Defendant Bates blamed production ramp-up issues with its HERO5 cameras and Karma which resulted in a shortage of those products.  GoPro, Q3 2016 Earnings Call; at 6 (Nov. 3, 2016) (transcript on file with Bloomberg, Inc.).  Defendant McGee also stated to investors that Karma,

GoPro's quadcopter drone, would represent slightly "less than 10%" of GoPro's fourth quarter revenue. *Id.* At 9.  No mention was made of Karma's crashing incidents.  *Id.*

105.   After being informed of the new $625 million fourth quarter revenue guidance, and that Karma drone sales would account for less than 10% of that revenue, analysts estimated that Karma would need to account for just under $60 million in revenue that quarter.  *See* Paul Coster, JP Morgan, *3Q16 Results: Another Reset* (Nov. 4, 2016).  At the very least, GoPro would need to sell around 50,000-75,000 units to bring in that much money.  *See* Piper Jaffray, *It Appears A "Karma Christmas" is Canceled with GoPro's Latest Recall* (Nov. 8, 2016).  Investors were unaware that the 10% revenue for GoPro's fourth quarter could not possibly be attained from 2,500 drones which GoPro had on hand.

106.   On this news, GoPro's shares fell $0.78 per share, or over 6.5% from the previous day's closing price of $11.94, to close at $11.16 per share on November 4, 2016.

107.   On November 4, 2016, GoPro filed its Form 10-Q for the third quarter of 2016 which updated its risk factors to include new italicized language below:

> To remain competitive and stimulate consumer demand, we must manage frequent product introductions and transitions.  The success of new product introductions depends on a number of factors including, but not limited to, timely and successful research and development, pricing, market and consumer acceptance, the effective forecasting and management of product demand, purchase commitments and inventory levels, ***the availability of products in appropriate quantities to meet anticipated demand***, the management of manufacturing and supply costs, ***the management of risks associated with new product production ramp-up issues***, and the risk that new products may have quality or other defects in the early stages of introduction.  In addition, the introduction or announcement of new products or product enhancements may shorten the life cycle of our existing products or reduce demand for our current products, thereby offsetting any benefits of successful product introductions and potentially lead to challenges in managing inventory of existing products. Failure to complete product transitions effectively or in a timely manner could harm our brand and lead to, among other things, lower revenue and excess inventory, ***or a deficit of inventory***.

GoPro, Form 10-Q, at 31 (Nov. 4, 2016).

108.   On November 8, 2016, after the market closed, GoPro announced that it was recalling all 2,500 of its Karma drones because they would lose power mid-flight.  Press Release, *GoPro Announces Karma Recall and Refund Program*, http://investor.gopro.com/press-

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1  releases/press-release-details/2016/GoPro-Announces-Karma-Recall-and-Refund-Program/

2  default.aspx (Nov. 8, 2016).

3      109.  On this news, GoPro's shares fell $0.45 per share, or over 4% from the previous

4  day's closing price of $10.86, to close at $10.41 per share on November 9, 2016.

5      110.  After the recall, GoPro did not update its revenue guidance.  During a call with

6  analysts on November 30, 2016, defendant McGee was asked about the impact of the Karma recall

7  on GoPro's numbers to which McGee responded, "[there] [w]asn't quite frankly that many of that

8  [Karma] that were out in the market."  GoPro, Nasdaq Investor Program, at 3 (Nov. 30, 2016)

9  (transcript on file with Bloomberg, Inc.).

10      111.  It was not until February 2, 2017, when GoPro revealed its fourth quarter and 2016

11  revenue, that investors were informed of the true impact of the Karma drone's supply deficit on

12  GoPro's revenue.  GoPro recorded $540.6 million in revenue for the fourth quarter of 2016 instead

13  of the minimum $600 million it had guided for the quarter, and experienced a GAAP loss of

14  approximately $116 million for the quarter.  *See* GoPro, Press Release, *GoPro Announces Fourth*

15  *Quarter and Fully Year 2016 Results* (Feb. 2, 2017).  During an earnings call that day, defendant

16  Woodman revealed that the Karma was GoPro's "***biggest challenge to [its] quarterly revenue[.]***"

17  GoPro, Q4 2016 Earnings Call, at 2 (Feb. 2, 2017) (transcript on file with Bloomberg, Inc.).  The

18  Company also missed its full year 2016 guidance, recording $1.185 billion in revenue instead of

19  the minimum $1.25 billion it had guided for the year.  *Id.*

20      112.  As a result of this news, GoPro's shares fell $1.39 per share, or over 12% from the

21  previous day's closing price of $10.97, to close at $9.58 per share on February 3, 2017.

22      **D.**    **Internal Company Documents Received in Response to Plaintiff's 220 Demand**

23              **Confirm the Individual Defendants' Knowledge**

24      113.  On March 8, 2017, the Plaintiff made the 220 Demand.

25      114.  After some negotiations regarding the validity and scope of the 220 Demand, the

26  Company agreed to turn documents over to Plaintiff pending the execution of a confidentiality

27  agreement.

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

115.   On August 24, 2017, the parties executed a confidentiality agreement and on September 15, 2017 Plaintiff received its first production of documents from GoPro.

116.   A subsequent production of documents was received by Plaintiff on October 6, 2017.

117.   ████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████

121.   Thus, it is clear, even if the Company had not been using NetSuite, the Individual Defendants were fully informed of all aspects regarding the Karma drone and HERO5 camera and the problems the Company was having with their launches.

122.   Moreover, it was clear to the Individual Defendants how important the emerging drone market was to the Company and its future earnings.



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

33



131.   Unfortunately, things went from bad to worse for GoPro.

133.   GoPro shares closed on October 6, 2016 at $16.79 a share.



**THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS[7]**

142.   On September 19, 2016, GoPro unveiled its new products, the HERO5 Black, HERO5 Session, and the Karma drone.  In the press release announcing the products, GoPro stated in relevant part:

> ***Karma will be available October 23rd in the following bundles***: [1] Karma 25 without a GoPro camera for $799.99 MSRP; [2] Karma bundled with HERO5 Black for $1099.99 MSRP; [and] [3] Karma bundled with HERO5 Session for $999.99 MSRP (available in early 2017).

143.   This statement was false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded material facts and failed to disclose GoPro lacked sufficient supply of Karma drones to make Karma readily available for sale on October 23, 2016 because GoPro had at most 2,500 drones available for sale.  Moreover, the documents from the ███████████████████████████████████████████████████████████████

███████████████████████████████████

144.   On the same day, the Company held a conference call with investors about the new products—the HERO5 cameras and the Karma drone—which it had unveiled, during which defendant McGee stated in relevant part:

> [Jason S. Mitchell, analyst at Bank of America]: Just had a quick question, so could you compare what your expectations for kind of this generation's product margins versus last given the lower price point of the HERO5 Black?  And then on the GoPro Plus service, do you expect that to be a free service to consumers or possibly charged for like heavy users that store a lot of video?
>
> [Brian McGee]: Thanks. This is Brian McGee. Yeah, on the margin, we've done an incredibly good job building cameras for 14 years.  I think we've learnt how to do that exceptionally well.  And again, these are no exceptions.  As we gave guidance on our July 27 conference call, we guided the second half to be 40% margin plus or minus 1 percentage point, we're still tracking to that. ***In addition, we talked about our revenue guidance for 2016, its $1.35 billion to $1.5 billion. We believe we're still on track to make that as well.  In addition, we're still tracking to make money in the fourth quarter on a GAAP and non-GAAP basis.***

---

[7]   Although many statements by the Defendants are listed in this section, the statements being challenged as false and/or misleading are those statements that ***are bolded, italicized***, and in some instances ***underlined*** for emphasis.

145.   These statements were false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts that they failed to disclose:

a)   GoPro was not "on track" to reach its revenue guidance due to GoPro's limited available supply of Karma drones and HERO5 cameras;

b)   Defendant McGee either did not in fact believe his opinion that GoPro was still on track to meet its revenue Guidance because he was aware of GoPro's supply shortages after reviewing GoPro's real-time inventory and supply monitoring systems; and

c)   ████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

146.   During the same September 19, 2016 call, defendant Woodman answered an analyst's question regarding distribution of the HERO5 cameras and Karma, stating:

> [Will V. Power, Analyst at Baird]: I know you announced the timing for October for the Karma and the HERO5 Black and HERO5 Session. Are those going to be broadly across all your existing distribution channels out of the gate, both domestically and internationally? And where does Karma sit on distribution, is that going to be in most of your channels, is that going to be in select channels, and what does that mean for the opportunity?

> [Woodman]: Sure.  If I understood you correctly, HERO5 cameras will be distributed through all GoPro retailers globally. *And Karma is initially going to be distributed through select retailers around the world, and then rolling out from there.*

147.   This statement was false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded that GoPro lacked sufficient supply of Karma drones to make Karma readily available for sale on October 23, 2016 because GoPro had at most 2500 drones available for sale. ███████████████████████████████
██████████████████████████████████████████████

148.   During that same call, GoPro, at the direction of the Individual Defendants advised investors to look at the Risk Factors section of its 2015 Form 10-K filed with the SEC on February

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

29, 2016 and signed by defendants Woodman, McGee, and Bates.  The 2015 Form 10-K states, in relevant part:

> **To remain competitive and stimulate consumer demand, we must manage frequent product introductions and transactions. The success of new product introductions depends on a number of factors including, but not limited to, timely and successful research and development, pricing, market and consumer acceptance, the effective forecasting and management of product demand, purchase commitments and inventory levels, the management of manufacturing and supply costs, and the risk that new products may have quality or other defects in the early stages of introduction.   In addition, the introduction or announcement of new products or product enhancements may shorten the life cycle of our existing products or reduce demand for our current products, thereby offsetting any benefits of successful product introductions and potentially lead to challenges in managing inventory of existing products.   Failure to complete product transitions effectively or in a timely manner could harm our brand and lead to, among other things, lower revenue and excess inventory.**

149.   These statements were false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose that GoPro omitted the following then-known and present material risks attending GoPro's new product launches of Karma drones and HERO5 cameras:   "the availability of products in appropriate quantities to meet anticipated demand," "the management of risks associated with new product production ramp-up issues," and that failure to complete product transitions effectively or in a timely manner could lead to "a deficit of inventory."

150.   Then, on October 3, 2016, the day after HERO5 cameras were available for purchase, defendant Woodman was interviewed by CNBC, and stated in relevant part:

> [Question]:  How long before we're seeing the products of these cameras out there? . . . Is that one quarter, is that two, or are we looking at, say, February after the holiday season?

> [Woodman]:  **I think it's going to be [an] exciting fourth quarter for GoPro, for all of our fans, and investors, as we see our customers adopt GoPro's new easy story-telling solutions. . .. I think after Christmas, we can expect a very nice post-holiday up-tick in the amount of stories being sold, shared[.]**

151.   These statements were false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

a)       GoPro lacked sufficient supply of HERO5 cameras to meet demand;

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

38

b)      GoPro lacked sufficient supply of Karma drones to meet demand; and

c)      ███████████████████████████

████████████████████████████████████

████████████████████████████████████

152.    On October 3, 2016, defendant Woodman was also interviewed by Brad Stone at Bloomberg West, and stated in relevant part:

[Brad Stone]:  Right, that's your drone, and how big of a part of the business do you expect that to be?

[Woodman]:  *Karma will be 799, available October 23rd.  And that is going to be a phenomenal contributor to the overall GoPro ecosystem.*

153.    These statements were false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

a)      GoPro lacked sufficient supply of Karma drones to make Karma readily available for sale on October 23, 2016 because GoPro had at most 2500 drones available for sale; and

b)      ████████████████████████████

████████████████████████████████████

████████████████████████████████████

154.    On October 23, 2016, GoPro posted the following on its Twitter account, "*#GoProKarma is here*."

155.    The statement above was false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

a)      GoPro lacked sufficient supply of Karma drones to meet demand and had at most 2,500 drones available for sale; and

b)      the 220 Documents show the Individual Defendants had every reason to believe that the Karma drone was not ready for mass production, and accordingly, there was no way the Company could attain its revenue guidance for the fourth quarter or the 2016 fiscal year.

156.   After the stock market closed on November 3, 2016, GoPro issued a press release announcing its 2016 third quarter results.  GoPro lowered its 2016 revenue guidance from $1.35–1.5 billion to "between $1.25 billion and $1.3 billion," and announced fourth quarter revenue guidance of "$625 million +/- $25 million."  Press Release, GoPro Announces Third Quarter 2016 Results,   http://investor.gopro.com/press-releases/press-release-details/2016/GoPro-Announces-Third-Quarter-2016-Results/default.aspx (Nov. 3, 2016).

157.   GoPro management hosted a conference call later that day to discuss the Company's financial results.  During the call, defendants Woodman, McGee, and Bates discussed the reasons underlying the dismal results:

[Woodman]: As good as these products are and as impactful as we expect them to be, unfortunately we experienced production issues that resulted in lower than expected launch volumes for HERO5 Black and Karma.  While our teams worked tirelessly to solve the problems; we expect the situation to have a negative impact on results for the second half of the year. As a consequence of our compromised production ramp, we were unable to fully restock channels, which have been cleared of legacy products during the third quarter.  And furthermore, we anticipate difficulty catching up to meet forecasted demand during the fourth quarter. As a result, third quarter revenue was up only 9% sequentially to $240 million.  We shipped slightly over 1 million cameras in the quarter and we are lowering our 2016 revenue expectations.  ***Despite the anticipated difficulty in meeting fourth quarter demand, we expect to be profitable for the quarter.***

\*     \*     \*

[McGee]: During the third quarter, we continued to focus on clearing channel inventory of our HERO4 product in preparation for the October 2 global launch of our HERO5 cameras.   We estimate HERO4 channel inventory decreased sequentially by over 70%. We estimate third quarter unit sell-through slightly exceeded sell-in, making this the fourth consecutive quarter where sell-through exceeded sell-in. During September, we globally shipped several hundred thousand units of our HERO5 cameras.  More units of HERO5 cameras were shipped in September 2016 than the units of HERO4 cameras that were shipped during the launch of those products in September 2014. Additionally, HERO5 was distributed more broadly versus the HERO4 launch. Regarding camera mix for the third quarter, our $399 and above cameras accounted for more than 50% of the units in revenue.  Demand reflected a strong preference for our flagship HERO5 Black camera, and demand for our HERO5 Session camera was in line with our expectations.

\*     \*     \*

[Paul Coster, Analyst at JP Morgan]: Nick, can you provide us a little bit of color around the production issues and did they affect both the camera and the drone and if, so why? And then, my second question is the profit profile next year, will it be

do you think a little bit more similar to 2015 where the profit was more front-end loaded than we saw last year? Thank you.

[Bates]: I'm sorry Paul, it's Tony. We were somehow on mute. Let me just pick up your first part, which was the production issues. ***Yes, we did have an issue on both the HERO5 and Karma, but bulk of the issue has really been around the H5 line, in particular H5 Black and fundamentally we found an issue very late.*** As we mentioned, demand is very strong and we are really essentially playing, once we address the issue, which we did very quickly with the team and then started to get a full ramp back up, we just can't catch up to the forecasted demand and that's what you see reflected. ***But there was a slight issue on both, but really the big issue has been on the H5.***

                              *        *        *

[Brad Erickson, Analyst at Pacific Crest]: Just in terms of the Q4 revenue composition, I guess, between action cameras and drones, it would seem like a fair assumption relative to the 2017 outlook as the unit growth would potentially be as high as mid-teens or maybe a little bit higher than that. Is that kind of the correct way to think about it? And then with the balance of the revenue coming from drones, or am I off there?

[McGee]: Hey, Brad. This is Brian. I think in the prepared remarks, I think we said bulk of the Q4 revenue would be cameras in terms of units, and then quads. So quad, on a percentage basis would be less than 10% for the quarter, if that helps.

158.   The statements in ¶¶ 156-157 above were false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

        a)   GoPro lacked sufficient supply of Karma drones to meet demand and had at most 2500 drones available for sale;

        b)   GoPro's revenue and profitability guidance were not attainable due to GoPro's limited available supply of Karma drones;

        c)   GoPro was aware of reports of Karma crashes that put it on alert of a design defect; and

        d)   ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

159.   On November 4, 2016, GoPro filed a Form 10-Q for the third quarter of 2016 with the SEC, and signed by defendants Woodman and McGee, which stated in relevant part:

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

Third quarter 2016 and recent highlights. We began shipping our all-new cloud connected HERO5 Black and HERO5 Session cameras into our global channel in late September 2016, which became available beginning October 2, 2016 at select stores, online retailers and at GoPro.com.  Our HERO5 cameras can auto-upload photos and videos to GoPro Plus, a new cloud-based subscription service that enables consumers to easily access, edit and share content.  In addition, GoPro Plus offers a range of additional premium benefits.  GoPro Plus launched in the United States on October 2, 2016 and is expected to be available in international markets in the first quarter of 2017. Complementing our new HERO5 cameras and GoPro Plus, we also released new versions of our Quik mobile and desktop applications, which are offered at no charge.  We began shipping our Karma drone and accessories after quarter-end, which became available online beginning October 23, 2016 and now available at major U.S. retailers.

160.   These statement(s) were false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

a)   GoPro lacked sufficient supply of Karma drones to make Karma readily available for sale on October 23, 2016 because GoPro had at most 2500 drones available for sale;

b)   GoPro lacked sufficient supply of Karma drones to meet demand and had at most 2500 drones available for sale; and

c)   ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

## A.   Statements About the Karma Drone's Capabilities

161.   On September 19, 2016, during the conference call discussing the launch of the HERO5 and Karma, defendant Woodman stated that "*[f]or Karma, flight time is 18 minutes*, and for HERO5 Black and HERO5 Session, battery times are significantly improved from previous HERO models we're just getting more efficient with – our hardware development systems are more efficient and we're really excited for the experience that customers are going to have."

162.   The statement above was false and/or misleading when made because the Individual Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

a)   GoPro's Karma drone suffered from an obvious design defect that caused drones to lose power mid-flight and crash;

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1         b)     GoPro failed to conduct adequate quality control testing of its Karma

2 drone's 18 minute flight time that would have detected the design defect in the drone's battery

3 latch; and

4         c)     ███████████████████████████████████████

5 ███████████████████████████████

6     163.    Beginning on September 19, 2016, GoPro's website, GoPro.com, began displaying

7 the following statement regarding the Karma drone, "More than a drone. ***Capture amazingly***

8 ***smooth footage in the air***, handheld or mounted to your favorite gear."

9     164.    The statement above was false and/or misleading when made because the Individual

10 Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

11         a)     GoPro's Karma drone suffered from an obvious design defect that caused

12 drones to lose power mid-flight and crash;

13         b)     GoPro failed to conduct adequate quality control testing of its Karma

14 drone's ability to capture aerial footage that would have detected the design defect in the drone's

15 battery latch; and

16         c)     ███████████████████████████████████████

17 ███████████████████████████████

18     165.    On October 3, 2016, defendant Woodman was interviewed by Brad Stone at

19 Bloomberg West, and stated in relevant part, "[o]ur ***customers can now fly their GoPros***, ***and***

20 ***capture incredible, both aerial and handheld footage, cause Karma is more than a drone***."

21     166.    The above statement was false and/or misleading when made because the Individual

22 Defendants knowingly or recklessly disregarded the following material facts and failed to disclose:

23         a)     GoPro's Karma drone suffered from an obvious design defect that caused

24 drones to lose power mid-flight and crash;

25         b)     GoPro failed to conduct adequate quality control testing of its Karma

26 drone's ability to fly and capture aerial footage that would have detected the design defect in the

27 drone's battery latch; and

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

43

1        c)    ████████████████████████████████

2  ████████████████████████████████

3      167.   After the market closed on November 8, 2016, GoPro announced the recall of

4  "approximately 2,500 Karma drones purchased by consumers since October 23[, 2016]." Press

5  Release, *GoPro Announces Karma Recall and Refund Program*, http://investor.gopro.com/press-

6  releases/press-release-details/2016/GoPro-Announces-Karma-Recall-and-Refund-

7  Program/default.aspx (Nov. 8, 2016). GoPro attributed the recall to "Karma units los[ing] power

8  during operation." *Id.*

9      168.   On this news, GoPro's shares fell $0.45 per share, or over 4% from the previous

10  day's closing price of $10.86, to close at $10.41 per share on November 9, 2016.

11      169.   The market was shocked by how few drones were sold and produced by GoPro.

12  Analysts at Piper Jaffray noted:

> We remain [Underweight] shares of GPRO following this evening's news release outlining the recall of 2,500 Karma drones purchased since October 23rd. ***This is not only a surprise to us, but another ding on management's credibility having just announced both the HERO5 and Karma drone at full production.*** The news release cited a power failure during flight as the cause of the recall. Having connected with management tonight, we believe the recall was to mitigate any potential safety issues. In the interim, GPRO is providing a full refund to customers. ***Not only were we surprised by the modest level of initial units sold, but we believe it is a possibility that Karma will not be available for the key holiday season***. We believe there could be further downside to our already Street low Q4 estimate of $545M.

19  Piper Jaffray, *It Appears A "Karma Christmas" is Canceled with GoPro's Latest Recall*, at 1 (Nov.

20  8, 2016); *see also* Steve Symington, The Motley Fool, *This Small Recall Is Terrible Karma for*

21  *GoPro*, https://www.fool.com/investing/2016/11/09/this-small-recall-is-terrible-karma-for-

22  gopro.aspx (Nov. 9, 2016) ("You read that right: Those 2,500 recalled drones represent *all* Karma

23  units sold by GoPro since the new quadcopter became available at retailers last month. It's an

24  underwhelming figure considering many investors had hoped Karma would help GoPro quickly

25  secure a formidable slice of the fast-growing, multi-billion-dollar consumer drone market.").

26      170.   Given the fact that GoPro stated that slightly less than 10% of its revenue would be

27  derived from Karma sales during the November 3, 2016 conference call, analysts had expected

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1  that GoPro would need to sell "50-75k Karma units" (around $60 million assuming a price point

2  of $799.99 for 75,000 units or around $80 million at the $1099.99 price point for 75,000 units if

3  the Karma is bundled with the HERO5 black to meet "the implied Q4 guidance of $625

4  [million][,]" a far cry from the 2,500 Karma drones purchased by consumers since launch (which

5  even assuming each drone was purchased at the highest priced $1099.99 bundle, would result in

6  revenues of $2.7 million).  *See* Piper Jaffray, *It Appears A "Karma Christmas" is Canceled with*

7  *GoPro's Latest Recall* (Nov. 8, 2016).  Even though GoPro's guidance was no longer feasible after

8  its recall, GoPro did not adjust its guidance.

9      171.  On November 30, 2016, GoPro filed a Form 8-K with the SEC stating that defendant

10 Bates would step down from his position as GoPro's president, effective December 31, 2016.

11 GoPro, Form 8-K (Nov. 30, 2016).  Defendant Bates would, however, remain on GoPro's Board.

12     172.  On January 30, 2017, after leaving the position vacant for almost two years, GoPro

13 appointed Charles Prober ("Prober") to the position of Chief Operating Officer ("COO").  GoPro,

14 Form 8-K (Jan. 30, 2017).

15     173.  On February 1, 2017, GoPro reintroduced the Karma drone, and explained that the

16 redesigned battery latch corrected Karma's power loss issues.   GoPro, Karma Is Back,

17 https://gopro.com/news/GoPro-Karma-Is-Back (Feb. 1, 2017).

18     174.  Then, after the market closed on February 2, 2017, GoPro announced its fourth

19 quarter and full year 2016 results.  Despite previous guidance stating that GoPro would be

20 profitable in the fourth quarter, "GoPro experienced a GAAP[8] *loss of $116 million, or $0.82 loss*

21 *per diluted share, in the fourth quarter of 2016*, . . . [but] was profitable on a non-GAAP basis

22 with income of $42 million."  Press Release, *GoPro Announces Fourth Quarter and Full Year*

23 *2016     Results*,     http://investor.gopro.com/press-releases/press-release-details/2016/GoPro-

24

25 _____

26 [8]  GAAP is an acronym for "Generally Accepted Accounting Principles" which are "a common set
   of accounting principles, standards and procedures that companies must follow when they compile
27 their financial statements." Investopedia.com, *Generally Accepted Acounting Principles – GAAP*,
   http://www.investopedia.com/terms/g/gaap.asp (last visited March 14, 2017).

28 _____

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

Announces-Fourth-Quarter-and-Full-Year-2015-Results/default.aspx (Feb. 2, 2017). GoPro missed its fourth quarter guidance of $625 million, bringing in only $540 million. GoPro also recorded $1.185 billion in total revenue for 2016, falling well below its previously lowered guidance of $1.2 to $1.3 billion. *Id.*

175. GoPro held a conference call with analysts that day discussing the dismal results. GoPro elaborated on its fourth quarter and year results:

> [Woodman]: In our November call, we detailed how our teams overcame initial HERO5 Black manufacturing issues and quickly ramped production. However, the initial scarcity had a knock-on effect, resulting in retailers canceling marketing support for the HERO5 Black launch. While the impact of less marketing is hard to quantify, we believe we missed an important opportunity to capture perishable demand during the holiday. Despite it all, we sold through an estimated two million cameras in the quarter. ***The biggest challenge to our quarterly revenue was related to our drone, Karma,*** which we withdrew from the market in November following a small number of cases where batteries disconnected during flight resulting in a loss of power. We identified the issue is related to the latch that secured the drone's battery. A redesigned latch has been incorporated into the updated Karma drone solving the issue.
>
> ***We guided that Karma would account for <u>slightly less than 10%</u> of our Q4 revenue. Karma is now back on the market***. Yesterday we announced that Karma is on sale at gopro.com select retailers in the U.S. in limited quantities while we ramp production. We plan to make Karma available in international markets this spring.

176. On this news, GoPro's shares fell $1.39 per share, or over 12% from the previous day's closing price of $10.97, to close at $9.58 per share on February 3, 2017.

177. On March 8, 2017, Prober, GoPro's new COO, discussed GoPro's botched holiday product launch season. Prober attributed the HERO5's production problem to the fact that the HERO5's waterproof design resulted in production shortages. *See* Selina Wang, Bloomberg, Can This Man Save GoPro (Mar. 8, 2017). As also noted in the article, "[w]ith sales slowing in 2015, Chief Executive Officer Nick Woodman bet on a new drone called Karma and a upgraded version of the popular Hero camera. Trying to rush the new products to market backfired." *Id*.

**INDIVIDUAL DEFENDANTS' KNOWLEDGE**

**A.    Individual Defendants' Access to and Possession of Adverse Facts**

178.    The Individual Defendants had access to and were in possession of adverse material facts regarding both the Karma drone and the HERO5 camera.   These adverse material facts included:

        a)      the Karma drone and HERO5 camera inventory deficits;

        b)      the inventory deficits impact on GoPro's quarterly revenues;

        c)      the drone's precarious design defect that caused the Karma drone to lose power mid-flight; and

        d)      customer responses to the aforementioned.

179.    As noted *supra*, GoPro utilized NetSuite, a cloud-based ERP system which allowed GoPro to monitor inventory, distribution, and supply chain issues in real-time.   Specifically, NetSuite enabled GoPro to generate report*s* regarding inventory level which were available to "senior executives" such as the Individual Defendants.   Viewing these reports would have alerted GoPro to the fact that the Company was experiencing a significant deficit in the supply of its Karma drones and HERO5 cameras.   The fact that reports began to surface about low inventory of both items shortly after their respective launches and that only 2,500 Karma drones had been produced and sold by November 8, 2016, suggested that it was obvious to the Individual Defendants, who had access to real-time inventory, distribution, and supply chain monitoring software, that GoPro would not meet its fourth quarter and revised fiscal year 2016 guidance if, *inter alia*, on November 3, 2016 it anticipated that slightly less than 10% of its $625 million (+/- $25 million)— approximately $60 million—of its fourth quarter 2016 revenue would come from drone sales. Accordingly, the Individual Defendants were aware of, or were deliberately reckless in disregarding, the Company's Karma and HERO5 production/inventory deficit, and their impact on GoPro's revenues.

180.    GoPro was aware of the demand for its Karma drones and HERO5 cameras. Defendant Woodman boasted that GoPro had "communicat[ed] with [GoPro's] retailers globally

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1    to prepare together as a team for new product launches and to maximize the marketing

2    opportunities around those launches[.]"  GoPro, Q2 2016 Earnings Call, at 11 (July 27, 2016)

3    (transcript on file with Bloomberg, Inc.).  Woodman also stated that GoPro monitored "sell-

4    through, the best reflection of consumer demand," as a factor in determining its outlook on its

5    holiday product launches.  *Id.* at 2.  Indeed, as noted by CFO Jack Lazar shortly before McGee

6    took his place, GoPro "track[ed] this stuff on a weekly basis."  GoPro, Q3 2015 Earnings Call, at

7    12 (Oct. 28, 2015) (transcript on file with Bloomberg, Inc.).  Given the previous problems with the

8    HERO4 Session, it is highly likely that tracking sell-through continued after Lazar's departure.  To

9    calculate sell-through, the ratio of inventory on hand to products sold to the consumer, GoPro

10   ***would necessarily need to know the inventory on hand***.  Indeed, Born had stated that GoPro knew

11   "***exactly how much product [was] at the distributors and sitting at [its] direct customers***."

12   Accordingly, in tracking sell-through for the Karma drone and HERO5 cameras, GoPro must have

13   had access to inventory levels of those products, or was deliberately reckless in not knowing those

14   products' inventory deficits.

15       181.   The Individual Defendants would have had access to and awareness of the fact that

16   Karma's battery latch contained a design defect, which would cause the drones to lose power mid-

17   flight.  In fact, Woodman had access to his very own Karma drone which he stated he used

18   "extensively[.]"  GoPro, Q2 2016 Earnings Call, at 11 (July 27, 2016) (transcript on file with

19   Bloomberg, Inc.).  Accordingly, the Individual Defendants would have had access to, or

20   deliberately disregarded, the fact that the Karma drone's battery "***clearly [did] not fit***" into the

21   drone, *see* Ex. A, and that adequate testing would have flagged this defect before videos of the

22   Karma drone were ever uploaded onto YouTube.  Brian Warholak, *GoPro Karma Hard Crash*,

23   https://www.youtube.com/watch?v=i4nRalvmBhA (Oct. 28, 2016); *see also* Ben Popper, The

24   Verge,   *Why   GoPro's   Karma   drone   came   crashing   down*,

25   http://www.theverge.com/2016/11/11/13597902/gopro-karma-drone-recall-crash-battery-fail

26   (Nov. 11, 2016) ("Discussions with drone industry experts and sources familiar with the process

27

28

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1  of engineering and designing the Karma drone, show that the company should have been prepared

2  for exactly this kind of incident.").

3      182.   Defendant Woodman also acknowledged in a Reddit "Ask Me Anything!" that

4  GoPro "scours the internet to discover cool GoPro videos" and noted that it was "one of the most

5  satisfying parts of working at GoPro[.]"   Reddit, *Hey Reddit . . . howzit?! Nick Woodman.*

6  *Founder/CEO               of                       GoPro,               AMA!*,

7  https://www.reddit.com/r/IAmA/comments/566c8j/hey_reddithowzit_nick_

8  woodman_founderceo_of_gopro/ (Oct. 6, 2016).   Accordingly, the Individual Defendants would

9  have had access to, or deliberately disregarded, Brian Warholak's October 28, 2016 video showing

10  the Karma drone crash 2 minutes into flight, and other videos like it.   Additionally, by consulting

11  the Company's their own support website, or users' calls to GoPro's customer service, the

12  Individual Defendants would have been made aware of the battery defect, or recklessly disregarded

13  this fact.

14      183.   ██████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████

18  **B.    Core Operations**

19      184.   GoPro acknowledged in its 2015 Form 10-K that the Company's "core" products

20  were the "HERO line of capture devices."   2015 Form 10-K at 6.   In January 2016, GoPro

21  announced its decision to end-of-life its entry level HERO, HERO+, and HERO+LCD products,

22  2015 Form 10-K at 6, and would stop selling them in April, Q4 2015 Earnings Call at 2 (Feb. 3,

23  2016) (transcript on file with Bloomberg, Inc.).   As of February 29, 2016, GoPro discontinued all

24  products introduced prior to 2014.   2015 Form 10-K at 6.   At the time the HERO5 line of cameras

25  and the Karma drone were unveiled in September 2016, GoPro had simplified its product line to

26  include only the HERO4 Session, HERO4 Silver, and HERO4 Black cameras, in addition to

27  mounts and accessories for its cameras.   2015 Form 10-K at 6.   With a slimmed-down product

28

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

offering, GoPro had a lot riding on the successful introduction of the HERO5 line and Karma drone. ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████

185.   The Individual Defendants discussed the significance of the sales of the HERO5 and Karma drones on its bottom line numerous times throughout 2016.  Despite the announcement of the first delay of the Karma drone on May 5, 2016, defendant McGee stated on an earnings call that day that "the vast majority of [GoPro's] full-year revenue" would be "occurring in the second half of [2016]," when GoPro planned to launch those new products.  GoPro, Q1 2016 Earnings Call, at 6 (May 5, 2016) (transcript on file with Bloomberg, Inc.).

186.   About two months later, defendant Woodman stated, "HERO5 and Karma will contribute to the largest introduction of products in our history, all in time for what we believe will be GoPro's most exciting fourth quarter, ever – a quarter where we expect to return to profitability."  GoPro, Press Release, *GoPro Announces Second Quarter 2016 Results* (July 27, 2016).  In its second quarter 2016 Form 10-Q, GoPro stated that "[w]e expect revenue to grow consecutively in each of the third and fourth quarters, as compared to the second quarter of 2016, based on our current expectations for [the HERO5 and Karma] product launches."  GoPro, Form 10-Q, at 22 (July 29, 2016).

187.   Reporters and analysts also stressed the importance of the Karma drone and HERO5 line of cameras on GoPro's financial prospects.  *See* Ryan Mac, *Can A Shiny New Drone And Revamped Cameras Rescue GoPro?* Forbes, (Sept. 19, 2016), https://www.forbes.com/sites/ryanmac/2016/09/19/are-a-shiny-drone-and-revamped-cameras-enough-to-rescue-gopro/#10e36bbe45a2 (last visited Mar. 12, 2017) (GoPro's "new devices include a much-anticipated drone, GoPro's first major product outside its core video-capturing devices, whose success—or failure—will weigh heavily on the company's future"); *GoPro Delivers Q2 Upside Primarily from ASPs, but Focus Remains on the HERO5s and Karma as GoPro Seeks to Rebound in 2016 . . .*, at 2, Wedbush (July 28, 2016) ("After the disappointing

launch of the HERO4 Session in July 2015 and a lack of new product launches directly ahead of the holidays last year, successful launches of the HERO5s and Karma are pivotal in restoring investor confidence in the company."); *GoPro Exceeds Low Expectations – 2H Depends on New Product Reception. . . .*, at 1, Dougherty & Company LLC (July 27, 2016) (". . . what's really going to drive revenue higher and meet expectations in the [second half of 2016] is a product refresh and/or new products."); *The Delay of GoPro's Drone Leads to Bad Karma for Investors . . .*, at 1, Wedbush (May 6, 2016) ("The delay of the Karma launch by roughly six months means that losses are likely to continue for at least another quarter . . . it is unlikely that GoPro will return to profitability until the HERO5 cameras launch[.]").

188.   Citing the negative impact to its revenue that resulted from its failure to accurately assess demand for the HERO4 Session in 2015, GoPro stated that a failure "to effectively manage new product introductions and transitions in the future, including our next generation capture devices, drones and content-management software solutions, our revenue and profitability will be materially affected."  2015 Form 10-K at 12 (Feb. 29, 2016).

189.   Central to GoPro's ability to effectively manage new product introductions and transactions, such as the HERO5 line of cameras and the Karma drones in 2016, was its ability to monitor supply chain issues.  As GoPro stated in the risk factors to its 2015 Form 10-K, GoPro is "***increasingly dependent on information systems*** to operate our e-commerce website, process transactions, respond to consumer inquiries, ***manage our supply chain and inventory***, ship goods on a timely basis, maintain cost-efficient operations, and complete timely ***and accurate financial reporting***."   2015 Form 10-K at 17; *see also* GoPro, Form 10-Q, at 20 (July 29, 2016) (incorporating by reference the 2015 Form 10-K risk factors); GoPro, Form 10-Q, at 30 (Nov. 4, 2016) (same).   As stated above, the Company relied on SaaS-based NetSuite, which gave GoPro and its senior executives the ability to monitor its supply chain and inventory in real-time.

190.   As former Chief Technology Officer Baumer stated, implementing NetSuite's ERP system enabled the Company to grow rapidly from 2009-2011.  Given that the Company grew significantly thereafter, NetSuite's ERP undoubtedly became even more essential.  Indeed, GoPro

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

noted in its 2015 Form 10-K that it was particularly "heavily reliant on SaaS enterprise resource planning systems to conduct our order and inventory management, e-commerce and financial transactions and reporting."  2015 Form 10-K a 17; *see also* GoPro, Form 10-Q, at 20 (July 29, 2016) (incorporating by reference the 2015 Form 10-K risk factors); GoPro, Form 10-Q, at 30 (Nov. 4, 2016) (same).

191.   The Individual Defendants sought to ease the market's concerns after the HERO4 session supply debacle in advance of the launch of the HERO5 line and Karma drones, repeatedly assuring investors that the Company was keeping a watchful eye on its supply chain and inventory. The Individual Defendants and other senior executives clearly had access to information about the Company's inventory because they regularly discussed it in detail in public.  For example, former CFO Lazar stated in October 2015 that GoPro tracked sell-through, the ratio of inventory on hand to products sold to consumers, on a "weekly basis."  In July 2016, defendant Woodman noted that the Company monitored "sell-through" to determine its outlook on its holiday product launches. Defendant Bates also assured investors that the Company was "closely tracking" inventory, and defendant McGee noted his belief that GoPro has "done a great job in channel inventory," and told investors to be "ready for a heck of a launch in the second half" after "existing products continue to sell out in the summer months."  Just two months before the October launch of the HERO5 line and Karma drones, Head of Corporate Development Born discussed the Company's expanded visibility into its inventory channel and knowledge of "exactly how much product is at the distributors and sitting at our direct customers."

192.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

193.   Therefore, the Individual Defendants, as senior level executives and/or directors were in such positions at the Company to access all material, non-public information concerning the status of GoPro's Karma drone and HERO5-related inventory and availability for sale and their impact on GoPro's revenue guidance on a real-time basis.

**C.   The Individual Defendants Changed GoPro's Risk Factors in Acknowledgement of the Production Problems**

194.   On November 4, 2016, GoPro filed a Form 10-Q for the period ending September 30, 2016 (the third quarter of 2016), in which it updated its risk factors to include the following additional language about factors that can affect the success of new product introductions: "***the availability of products in appropriate quantities to meet anticipated demand***;" and "***the management of risks associated with new product production ramp-up issues***."  Form 10-Q, at 31 (Nov. 4, 2016).  It also added "***a deficit of inventory***" to the list of risks that could occur if the Company fails to complete product transitions effectively or timely.  *Id.*

195.   This update confirms that the Company knew about the HERO5 cameras' and Karma drones' supply problems before they were revealed for several reasons.  First, the timing of the update is suspect given it was made after October 23, 2016 when GoPro was already aware of its HERO5 and Karma shortages.  Second, based on earlier analysts' statements, the Company's Karma drone registration page, and the revised fourth quarter guidance issued on November 3, 2016, the anticipated demand for the Karma drone alone was somewhere between 50,000-150,000 units in 2016.  As ***only four days later*** it was revealed that only 2,500 drones had been produced and sold thus far, and that numerous reports had surfaced that those who wanted to purchase the drone could not find them for sale, it is highly unlikely that the Company updated this risk factor on November 4th without realizing that it lacked sufficient supply to meet the anticipated demand

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

53

1   for the Karma drone; rather the update was in response to that problem.  Third, the fact that the

2   updated risk factors appear in the November 4, 2016 Form 10-Q, which applies to the three-month

3   period ending September 30, 2016, suggests that the Company was aware of these supply problems

4   as of September 30.  Otherwise, they could have waited to update their risk factors until they filed

5   their annual report for 2016, which would encompass the period from October 1 to December 31,

6   2016, during which time the HERO5 and Karma drones became available and the supply problems

7   were eventually disclosed to the market.

8                                   **DAMAGES TO GOPRO**

9          196.    Because of the Individual Defendants' wrongful conduct, GoPro disseminated false

10  and misleading statements and omitted material information to make such statements not false and

11  misleading when made.  The improper statements have devastated GoPro's credibility.  GoPro has

12  been, and will continue to be, severely damaged and injured by the Individual Defendants'

13  misconduct.

14         197.    Indeed, the Individual Defendants' false and misleading statements as alleged

15  above, have subjected GoPro to a complaint for violation of the federal securities laws in the

16  United States District Court for the Northern District of California, captioned *Larkin vs. GoPro,*

17  *Inc., et al.*, Case No. 4:16-CV-06654-CW (the "Securities Class Action").

18         198.    Moreover, the likelihood of the Company continuing to suffer damages because of

19  the Securities Class Action is undeniable given the denial of defendants' motion to dismiss the

20  Securities Class Action.  In denying the motion to dismiss, the court concluded:

21             In light of the company's ability to track its inventory, it is plausible to infer that
               Defendants knew that 2,500 drones would be insufficient to make Karma globally
22             available at multiple retailers on the launch date. The inference of scienter is
               particularly strong, because Defendants, despite the low number of drones alleged
23             to be available, were priming the market for the sale of 100,000 to 150,000 drones
               during the fourth quarter of 2016. (internal citations omitted).
24
           199.    The court in the Securities Class Action further held that plaintiffs' allegations were
25
    "bolstered by allegations of circumstantial evidence."  Specifically, the court held:
26
               These include the timing of corrective statements and updates to risk factors as well
27             as the resignation of Bates as GoPro's president. Most notably, Woodman and
               McGee's Sarbanes-Oxley Act certifications filed with the SEC support their
28

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1    scienter, because those certifications required them to access sufficient reporting
2    information to certify that the information provided did not omit any material facts
to make the report not misleading.  (Internal citations omitted).

3    200.    As a direct and proximate result of the Individual Defendants' actions as alleged

4 above, GoPro's market capitalization has been substantially damaged, losing millions of dollars in

5 value as a result of the conduct described herein.

6    201.    Moreover, these actions have irreparably damaged GoPro's corporate image and

7 goodwill.  For at least the foreseeable future, GoPro will suffer from what is known as the "liar's

8 discount," a term applied to the stocks of companies who have been implicated in illegal behavior

9 and have misled the investing public, such that GoPro's ability to raise equity capital or debt on

10 favorable terms in the future is now impaired.

11    **PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS**

12    202.    Plaintiff incorporates by reference and realleges each and every allegation set forth

13 above, as though fully set forth herein.

14    203.    Plaintiff brings this action derivatively in the right and for the benefit of the

15 company to redress the Individual Defendants' breaches of fiduciary duties.

16    204.    Plaintiff is an owner of GoPro common stock and was an owner of GoPro common

17 stock at all times relevant hereto.

18    205.    Plaintiff will adequately and fairly represent the interests of the Company and its

19 shareholders in enforcing and prosecuting its rights.

20    206.    As a result of the facts set forth herein, Plaintiff has not made any demand on the

21 GoPro Board to institute this action against the Individual Defendants.  Such a demand would be

22 a futile and useless act because the Board is incapable of making an independent and disinterested

23 decision to institute and vigorously prosecute this action.

24    207.    At the time this action was commenced, the Board consisted of seven directors:

25 defendants Woodman, Bates, Goldman, Gotcher, Lurie and non-defendants Susan Lyne and

26 Lauren Zalaznick.  Defendants Woodman, Bates, Goldman, Gotcher, and Lurie are incapable of

27 making an independent and disinterested decision to institute and vigorously prosecute this action.

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

Because these defendants represent a majority of the Board, any demand on the Board would be futile.

### A. Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability

208. Defendants Woodman, Bates, Goldman, Gotcher, and Lurie (the "Director Defendants") face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

209. Moreover, defendants Woodman, Bates, Goldman, Gotcher, and Lurie, as directors, owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

210. Defendants Woodman, Bates, Goldman, Gotcher, and Lurie's making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability. If defendants Woodman, Bates, Goldman, Gotcher, and Lurie were to bring a suit on behalf of GoPro to recover damages sustained as a result

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

56

of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

211.  ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

## B.  Defendant Woodman Lacks Independence

212.  As an initial matter, GoPro has conceded in its SEC filings that Woodman is not an independent director of the Company.  In its April 26, 2017 annual proxy statement[9], GoPro states that:

> Our board of directors has determined that Messrs. Goldman, Marks, Gilhuly, and Gotcher, and Mses. Lyne and Zalaznick are "independent directors" as defined under the applicable rules, regulations and listing standards of NASDAQ and applicable rules and regulations promulgated by the SEC.

213.  In addition to this lack of independence, defendant Woodman is not disinterested for purposes of demand futility because he is the founder of GoPro and his principal occupation is CEO and Chairman of the Board of GoPro.  According to the Company's SEC filings, between 2014 and 2016, Woodman received total compensation of $77,427,175, $805,217, and $1,213,255, respectively.

214.  Moreover, defendant Woodman is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

---

[9]  *See* GoPro, Annual Proxy Statement (Form 14A) (Apr. 26, 2017).

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1

### C.     Defendant Bates Lacks Independence

2

215.     As an initial matter, GoPro has conceded in its SEC filings that Bates is not an

3

independent director of the Company.  In its April 26, 2017 annual proxy statement[10], GoPro states

4

that:

5

> Our board of directors has determined that Messrs. Goldman, Marks, Gilhuly, and
> Gotcher, and Mses. Lyne and Zalaznick, are "independent directors" as defined
> under the applicable rules, regulations and listing standards of NASDAQ and
> applicable rules and regulations promulgated by the SEC.

6

7

216.     Undoubtedly, the Company does not believe defendant Bates is independent

8

because he served as the Company's President from June 2014 to December 2016.  According to

9

the Company's SEC filings, between 2014 and 2016, Bates received total compensation of

10

$27,586,968, $2,524,987, and $12,750,120, respectively.

11

12

217.     Moreover, defendant Bates is incapable of considering a demand to commence and

13

vigorously prosecute this action because he faces additional substantial likelihood of liability as

he is a named defendant in the Securities Class Action.

14

### D.     Demand Is Excused Because a Majority of the Current Board Members are not Disinterested as They Face a Substantial Likelihood of Liability

15

16

218.     Defendants Woodman, Bates, Goldman, Gotcher, and Lurie are not disinterested

17

because they each face a substantial likelihood of liability in light of their false and misleading

18

statements as outlined above.

19

### E.     Demand is Futile as to Defendants Woodman, Bates, Goldman, Gotcher, and Lurie for the Following Additional Reasons

20

21

219.     If GoPro's current officers and directors are protected against personal liability for

22

their breaches of fiduciary duties alleged in this complaint by Directors & Officers Liability

23

Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their

24

protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is

25

informed and believes that the D&O Insurance policies covering the Individual Defendants in this

26

27

---

[10]  *See* GoPro, Annual Proxy Statement (Form 14A) (Apr. 26, 2017).

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1   case contain provisions that eliminate coverage for any action brought directly by GoPro against

2   the Individual Defendants, known as the "insured versus insured exclusion."

3         220.   As a result, if defendants Woodman, Bates, Goldman, Gotcher, and Lurie were to

4   sue themselves or certain of the officers of GoPro, there would be no D&O Insurance protection,

5   and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit

6   is brought derivatively, as this action is brought, such insurance coverage exists and will provide

7   a basis for the Company to effectuate recovery.   Therefore, defendants Woodman, Bates,

8   Goldman, Gotcher, and Lurie cannot be expected to file the claims asserted in this derivative

9   lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

10        221.   Under the factual circumstances described herein, the Individual Defendants are

11  more interested in protecting themselves than they are in protecting GoPro by prosecuting this

12  action.  Therefore, demand on GoPro and its Board is futile and is excused.  GoPro has been and

13  will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.

14  Yet, defendants Woodman, Bates, Goldman, Gotcher, and Lurie have not filed any lawsuits against

15  themselves or others who were responsible for the wrongful conduct.  Thus, defendants Woodman,

16  Bates, Goldman, Gotcher, and Lurie are breaching their fiduciary duties to the Company and face

17  a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them

18  futile.

19                        **AIDING AND ABETTING AND CONCERTED ACTION**

20        222.   In committing the wrongful acts alleged herein, each Individual Defendant has

21  pursued or joined in the pursuit of a common course of conduct and acted in concert with one

22  another in furtherance of their common plan.  In addition to the wrongful conduct herein alleged

23  as giving rise to primary liability, the Individual Defendants further aided and abetted and/or

24  assisted each other in breaching their respective duties.

25        223.   The purpose and effect of the Individual Defendants' common course of conduct

26  was, among other things, to disguise their violations of law and breaches of fiduciary duty, and to

27

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

enhance executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

224. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to conceal the fact that GoPro was misrepresenting the financial status of its business and financial results.

225. The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently violate state and federal law, the federal securities laws, and abdicate their duties as directors. Each Individual Defendant was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

226. Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

227. At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendants and were at all times acting within the course and scope of such agency.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

228. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

229. The Individual Defendants each owed GoPro and its shareholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

230.   The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of GoPro.

231.   The Individual Defendants breached their fiduciary duties owed to GoPro and its shareholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets and unnecessarily expend corporate funds. They also failed to properly oversee GoPro's business, rendering them personally liable to the Company.

232.   Each of the Individual Defendants had actual or constructive knowledge that the Karma drone and HERO5 camera were having production problems and that their launches would not support the financial guidance being touted by the Individual Defendants.  Regardless, the Individual Defendants continued to make false and misleading statements about the Karma drones' and HERO5 cameras' launches and the profits which would purportedly be realized by the Company from the launches.

233.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, candor, and due care, as alleged herein, GoPro has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## <u>COUNT II</u>

### AGAINST DEFENDANTS BATES, GILHULY, AND MARKS FOR BREACH OF FIDUCIARY DUTY IN CONNECTION WITH MISAPPROPRIATION OF INFORMATION AND INSIDER STOCK SALES

234.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

235.   At the time of each of the stock sales set forth herein, defendants Bates, Gilhuly, and Marks knew, but did not disclose publicly, that the Company falsely stated its ability to successfully launch both the Karma drone and the HERO5 camera.  Defendants Bates, Gilhuly, and Marks further knew, but did not disclose publicly, that the Company's revenue guidances were false and could not be met given the problems with the Karma drone and HERO5 camera launches.

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1  Defendants Bates, Gilhuly, and Marks made each of the stock sales described herein on the basis

2  of and because of their knowledge of the material non-public information described herein.

3  236.   At the time of their stock sales, defendants Bates, Gilhuly, and Marks knew that

4  when the Company's false and misleading statements came to light, the price of the Company's

5  common stock would dramatically decrease. ████████████████████████████

6  ████████████████████████████████████████

7  █████████████████████████ Defendants Bates', Gilhuly's,

8  and Marks' sales of GoPro common stock based on their knowledge of this material non-public

9  information was a breach of their fiduciary duties of loyalty and good faith.

10  **COUNT III**

11  **AGAINST DEFENDANTS BATES, GILHULY,
   AND MARKS FOR UNJUST ENRICHMENT**

12

13  237.   Plaintiff incorporates by reference all preceding and subsequent paragraphs as if

14  fully set forth herein.

15  238.   Defendants Bates, Gilhuly, and Marks were unjustly enriched by their receipt of

16  proceeds from their illegal sales of GoPro common stock, as alleged herein, and it would be

17  unconscionable to allow them to retain the benefits of their illegal conduct.

18  239.   To remedy Defendants Bates', Gilhuly's, and Marks' unjust enrichment, the Court

19  should order them to disgorge to the Company all proceeds derived from their illegal sales of

20  GoPro common stock.

21  **COUNT IV**

22  **AGAINST DEFENDANTS BATES, GILHULY, AND MARKS
   FOR VIOLATION OF CAL. CORP. CODE § 25402**

23  240.   Plaintiff incorporates by reference and re-alleges each and every allegation

24  contained above, as though fully set forth herein.

25  241.   At the time Defendants Bates, Gilhuly, and Marks sold their GoPro common stock,

26  they were directors of GoPro, positions which gave them access, directly or indirectly, to material

27  information about GoPro not generally available to the public.

28

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

62

242.     Defendants Bates, Gilhuly, and Marks knew these facts were not intended to be available to the public. Had such information been generally available to the public, it would have significantly reduced the market price of GoPro common stock.

243.     Defendants Bates, Gilhuly, and Marks had knowledge of material, adverse, non-public information and sold their GoPro common stock in violation of California Corporations Code § 25402.

244.     Defendants Bates, Gilhuly, and Marks are liable for damages in an amount up to three times the difference between the price at which the security was sold and the market value which the security would have had at the time of the sale if the information known to Defendants Bates, Gilhuly, and Marks had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information – pursuant to California Corporations Code § 25502.5.

245.     On information and belief, Plaintiff alleges that GoPro has total assets in excess of one million dollars and has a class of equity security held of record by 500 or more persons.

246.     Defendants Bates, Gilhuly, and Marks are also liable for reasonable attorney's fees and costs under California Corporations Code § 25502.5.

## <u>COUNT V</u>

### AGAINST DEFENDANTS WOODMAN AND BATES FOR FEDERAL CONTRIBUTION AND INDEMNIFICATION

247.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

248.     This claim is brought derivatively on behalf of the Company against defendants Woodman and Bates for contribution and indemnification.

249.     Defendants Woodman and Bates herein have been named as defendants in the Securities Class Action, as alleged herein.

250.     Defendants Woodman and Bates had a duty not to defraud the investing public by the dissemination of materially false and misleading statements.

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

251.   Although Plaintiff does not adopt the allegations of wrongdoing that are alleged in the Securities Class Action as its own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and defendants Woodman and Bates are liable to the Company for contribution and indemnification.

252.   Accordingly, Plaintiff asserts this claim derivatively for contribution and indemnification, as provided by federal statute.

WHEREFORE, Plaintiff demands judgment as follows:

A.   Declaring that Plaintiff may maintain this derivative action on behalf of GoPro and that Plaintiff is a proper and adequate representative of the Company;

B.   Determining the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to GoPro;

C.   Declaring that the Individual Defendants are obligated to contribute to, indemnify, and hold GoPro harmless from any fines, penalties, judgment, settlement, or award pursuant to any of the class actions pending or to be filed against GoPro or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

D.   Awarding GoPro the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

E.   Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

F.   Ordering defendants Bates, Gilhuly, and Marks to disgorge to the Company all proceeds derived from their sales of GoPro common stock alleged herein;

G.   Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

H.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

---

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

1   I.  Granting such other and further relief as the Court deems just and
proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

Dated:  November 8, 2017      Respectfully submitted,

             THE WAGNER FIRM


             _____*/s/  Avi Wagner*_____
             Avi Wagner (#226688)
              *avi@thewagnerfirm.com*
             1925 Century Park East, Suite 2100
             Los Angeles, California 90067
             Telephone:  (310) 491-7949
             Facsimile:  (310) 491-7949

             BRAGAR EAGEL & SQUIRE, P.C.
             Lawrence P. Eagel
              *eagel@bespc.com*
             David J. Stone
              *stone@bespc.com*
             Todd H. Henderson
              *henderson@bespc.com*
             885 Third Avenue, Suite 3040
             New York, New York 10022
             Telephone: (212) 308-5858
             Facsimile: (212) 486-0462

             HYNES KELLER & HERNANDEZ, LLC
             Michael J. Hynes
              *mhynes@hkh-lawfirm.com*
             Ligaya T. Hernandez
              *lhernandez@hkh-lawfirm.com*
             101 Lindenwood Drive, Suite 225
             Malvern, PA 19355
             Telephone: (484) 875-3116
             Facsimile: (914) 752-3041

Verified Shareholder Derivative Complaint
FILED UNDER SEAL

**VERIFICATION**

I, Harvey Sheff, am the Trustee of H Sheff B Sheff-Meiselman K Sheff David Sheff Family Trust U/A DTD 09/06/2016 (the "Trust") and am authorized to make this verification on its behalf.  I hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Verified  Shareholder Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information, and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATED: November 7 , 2017



Harvey Sheff